[No. 32101. *En Banc.* December 17, 1953.]

JOHN MAHONEY, *Respondent*, v. SAILORS' UNION OF THE PACIFIC *et al.*, *Appellants*.[1]

[1]Reported in 264 P. (2d) 1095.

*Levinson & Friedman (Kneland C. Tanner,* of counsel), for appellants.

*Monheimer, Schermer & Mifflin,* for respondent.

GRADY, C. J.—This action was brought by John Mahoney against Sailors' Union of the Pacific, a voluntary association, to secure a judgment setting aside an order expelling him from the union, commanding his reinstatement, and awarding damages. The court granted the relief prayed for by Mahoney and awarded judgment in the sum of $3,533.63, and a further award of $453.90 per month, less earnings from October 30, 1951, until such time as the judgment would become final. And it provided that at such time the court would make a determination of the amount of additional judgment. Injunctive relief against expulsion was awarded. The union appealed.

Respondent was a member of appellant union and a sailor by occupation. It is in this manner that he earns a livelihood. When respondent became a member of the union, he took the following obligation:

"I pledge my honor as a man, that I will be faithful to

this Union, and that I will work for its interest and will look upon every member as my brother; that I will not work for less than Union wages and that I will obey all orders of the Union. I promise that I will never reveal the proceedings of the Union to its injury or to persons not entitled to know it. And if I break this promise, I ask every member to treat me as unworthy of friendship and acquaintance. So HELP ME GOD!"

The constitution of the union contained the following provisions:

" 'ARTICLE III. Membership. SECTION 4. . . . Any member who advocates and/or gives aid to the principles and policies of any hostile or dual organization, or gives aid or comfort to such, shall be denied further membership in this Union . . .

" 'ARTICLE V. Duties of Members. SECTION 1. It shall be the duty of each member to be true and loyal to the Union and the labor cause, and to endeavor to put into practice the principles laid down in the Preamble. Members shall treat the officers of the Union while discharging their duties with due respect and consideration, and yield strict obedience to such rules as the Union may see fit to adopt.' "

Article 19, section 1, of the constitution and by-laws of the union provides:

" 'Any charge of violating the laws and rules of the union made against any member must be submitted in writing to regular meeting. Thereupon a trial committee of five full members shall be elected to which said charges shall be referred without discussion. Such committee shall be elected in a Port most convenient to both accused, and accuser, and witnesses.' "

On May 23 and June 6, 1949, respondent attended union meetings in Seattle at which he made remarks resulting in the following charges being preferred against him:

" 'We, the undersigned book members and officials of the Sailors Union of the Pacific, hereby prefer charges against John Mahoney, Book No. 4344, for the following reason:

" 'Mahoney's scurrilous and defamatory remarks entered in the minutes of the Seattle meeting May 23, 1949 when John Mahoney "wanted to know who gave the pie-cards the authority to engage in strike breaking activities and how come the membership of the organization were not kept ad-

vised of this" and also because of his remarks entered in the minutes of the Seattle meeting June 6, 1949 when Mahoney reiterated the same statement.

" 'The above are definite violations of the Constitution of the Sailors Union of the Pacific which are listed as follows:

" '1.  Violation of the Obligation

" '2.  Violation of Article III, Section 4

" '3.  Violation of Article V, Section 1

" 'We hereby request that John Mahoney, Book No. 4344, appear before a trial committee at Headquarters in accordance with Article XIX, Section 1. . . .' "

On July 12, 1949, a trial was conducted by the union in San Francisco. The respondent did not appear at the trial. An order was entered expelling respondent from the union.

The judgment of the court setting aside the order expelling respondent from the union must be affirmed for three reasons: (1) expulsion from the union deprived respondent of a property right without due process of law; (2) appellant violated the above-quoted provision of its constitution in conducting the trial at San Francisco instead of Seattle, the place where the alleged offense occurred, and also denied respondent procedural due process of law; and (3) the conduct of respondent was not a violation of the union constitution for which he can be expelled from the union.

Without membership in the appellant union, respondent would be unable to secure employment as a sailor upon any vessel leaving ports within its jurisdiction. The union issued shipping cards to its members. When a vessel owner desired sailors, he so advised the union, and the jobs were posted at its hiring hall. Members competed for a job by handing in their shipping cards, and the member whose card bore the oldest date was given the job. On August 4, 1949, respondent held the most eligible card for a job on the "S. S. Baranof", but because of his expulsion he was refused the job.

The charges preferred against respondent and upon which he was tried were not sufficient from a legal standpoint to warrant expulsion from the union when the effect of such expulsion was to disable him from securing employment as a sailor. The following of a lawful vocation

by which one may earn a livelihood is a property right of which one may not be deprived without due process of law. *Jones v. Leslie*, 61 Wash. 107, 112 Pac. 81; *Washington Local Lodge, etc. v. International Brotherhood of Boilermakers*, 33 Wn. (2d) 1, 203 P. (2d) 1019; *Nissen v. International Brotherhood, etc.*, 229 Iowa 1028, 295 N. W. 858, 141 A. L. R. 598; *Lo Bianco v. Cushing*, 117 N. J. Eq. 593, 177 Atl. 102; *DeMille v. American Federation of Radio Artists*, 31 Cal. (2d) 139, 187 P. (2d) 769, 175 A. L. R. 382. These cases cite others which recognize and apply the same rules of law.

The basic thought expressed by the courts is that if the union chooses to have the advantage of closed or union shop provisions in its contracts with employees, it must in turn preserve and protect membership in the union.

We do not wish to be understood as holding that a union may not reasonably discipline its members for infractions of its laws, rules, and regulations, but such discipline must not be of such a character as to deprive a member of a property right. Nor do we exclude the idea that a situation may exist where expulsion would be lawful. Such a question must be met and determined if and when it arises.

■■ The procedural machinery for the trial of union members by one of its authorized tribunals must also meet the requirements of due process of law. The constitution and by-laws of the union provide that such trials shall be held at a port most convenient to accused, accuser, and witnesses, and generally this is the place where the alleged offense was committed. The record shows that the objectionable statements made by respondent were made at meetings of the union in Seattle, and necessarily what was said by him on those occasions would be heard only by the members present. One cannot escape the conclusion that the port of Seattle would have been most convenient to respondent, the union, and the members present at the meetings. The union's constitutional provision follows the general rules of law on the subject of place of trial, and conducting the trial at San Francisco was not only contrary to the union's constitution and by-laws but denied respondent procedural due process of law.

The subjects of membership in a union being a property right and procedural requirements of trials before union tribunals, are discussed in 27 Wash. L. Rev. 211, and 4 Stanford L. Rev. 177. The article in the Stanford Law Review gives a history of and discusses the controversy between respondent and appellant. We invite those interested in the subject of property rights of workmen to read and consider what was said by Chief Justice Dunbar in the case of *Jones v. Leslie, supra*, and quoted on page 70 of 33 Wn. (2d).

■ The conduct of respondent, either as charged or proved, was not a violation of the union constitution for which he can be expelled from the union. Whether it be said that he asked a question or made a statement, he did so in the union meeting. He spoke there upon union policies, as a member of the union, to the other members present. This he should be able to do freely, without fear of expulsion. The union constitution does not provide to the contrary. The trial court was correct in holding, in effect, that speech *per se* is not rebellion. See 4 Stanford L. Rev. 177, p. 212. The charge being insufficient, the proceeding based upon it was a nullity and plaintiff's expulsion was void. *Leo v. Local Union No. 612 of International Union of Operating Engineers*, 26 Wn. (2d) 498, 514, 517, 174 P. (2d) 523, 168 A. L. R. 1440 (1946), and case cited.

■ The court made findings of fact which are supported by the evidence and among them found that respondent, by reason of his expulsion from the union, had been unable to obtain employment as a sailor upon any of the vessels shipping from Pacific coast ports since April 17, 1950; that his average earnings during the past several years when employed as a sailor have been four hundred twenty-five dollars per month; that between April 17, 1950, and October 30, 1951 (the date of trial), he had suffered a loss of earnings in the sum of four hundred twenty-five dollars per month; and that this would continue until such time as he was reinstated in the union, given a shipping card, and permitted to again be employed on sailing vessels. The court ordered that upon the decree in the case becoming final, upon appeal or otherwise, a determination should then

be made as to any additional damages since October 30, 1951, which respondent may suffer by reason of the expulsion.

The court adopted a correct method of arriving at the damages suffered by respondent up to the time of the trial and provided a proper method for determining subsequent damages until the judgment becomes final upon appeal to this court and respondent is reinstated in the union with all of his former rights and privileges.

The judgment is affirmed.

MALLERY, HILL, HAMLEY, DONWORTH, WEAVER, and OLSON, JJ., concur.

FINLEY, J. (dissenting)—There is more to this case than meets the casual eye. John Mahoney, plaintiff, is seeking reinstatement as a member of the Sailors' Union of the Pacific and damages representing employment earnings, which he claims he lost because of his allegedly wrongful expulsion from the union. On one side of the controversy, the union claims that Mahoney's expulsion was justifiable and proper; that he was a disloyal member; that his conduct at certain union meetings (a) violated union principles, policies, and certain union constitutional provisions, (b) was disruptive and seriously adverse to the best interests of his union, and (c) gave support and aid to a rival union, The Canadian Seamen's Union, whose officers purportedly were identified with certain left-wing interests in the Canadian labor movement. On the other side of the controversy, Mahoney claims that his conduct was not improper; that, in effect, it constituted merely an exercise of the right of freedom of speech at a union meeting; that he has been deprived of union membership without proper justification therefor in a manner inconsistent with recognized principles of due process of law. The trial court decided in favor of Mahoney, ordered that he be reinstated, and awarded him damages. The union appealed.

The briefs on appeal show there is some considerable disagreement between appellants and respondent as to the questions which should be considered and resolved in de-

ciding this case. Their disagreement seems to be based upon conflicting interpretations of the operative facts.

Occasionally, in a debate, lawsuit, or dispute of international proportions, the manner in which questions and issues are stated may be of some considerable significance. Regarded superficially, this case may appear to be an extremely simple one, involving merely a question of the right of a member of a labor union to express or state his views democratically as to a matter under discussion at a membership meeting of his union. Or the case may seem to present merely the question of whether membership in a union by some timid soul, average worker, or lower-income citizen, involves a property right which should be protected by the courts because of the significance today of union membership relative to employment and the earning of a living by so many individuals in our society. To me, the case is not such a simple one.

I have become convinced that the questions in this case, properly stated and entitled to the most emphasis, are:

(1) Whether a majority of the members of a labor organization have a right to determine the policies of their organization (assuming, of course, that such policies are not prohibited by law);

(2) Whether the majority, through duly elected union officials, may act to implement validly adopted union policies, and may expel a dissenting minority member, who not only is opposed to such union policies as a matter of principle, discussion, or debate, but has actively endeavored to disrupt and obstruct such policies, thereby aiding a rival, purportedly communist-dominated, union.

In view of the foregoing, a detailed and somewhat lengthy summary of the facts here at the beginning may be helpful in arriving at a proper understanding of the case and the issues involved.

The membership of the Sailors' Union of the Pacific (SUP) consists mainly of sailors who man vessels operating out of Pacific Coast ports and on the Great Lakes. As is the case with many unions, SUP has adopted a written constitution. However, the organizational structure of SUP differs

from that found in the usual labor union. The headquarters of SUP are in San Francisco. There are branches in Seattle, Portland, New York, and other large American ports, and also in Hawaii. With the possible exception of the headquarters office in San Francisco, the branches have much less local autonomy than geographical units or "locals" of other labor unions. In other words, in many respects the entire membership of SUP and the entire organization constitutes one single, closely interrelated or cohesive entity. The chief executive of SUP is its secretary-treasurer. The office presently is held by Harry Lundeberg, one of the appellants herein. The SUP also has an assistant secretary. In each port where a branch of SUP is maintained, there is one official designated as "agent," and one or more officials known as a "patrolman." Each agent is the administrative head of the particular branch and is assisted by one or more patrolmen. All of the aforementioned officials are elected by *the entire membership of all of the various branches of SUP, including the headquarters in San Francisco.* The secretary-treasurer and the assistant secretary have their offices in San Francisco.

It is significant that meetings for the discussion and conduct of union business are held regularly in the various port branches every Monday night. Those members present elect from their number a presiding officer and a secretary for the particular meeting. The minutes of each branch meeting are promptly transmitted to the other branches. They are read at the next meeting of the other branches. The minutes cover business transacted, actions taken, and discussions of such matters. *The membership of the various branches regularly vote whether or not to concur as to the minutes of previous meetings of the other branches,* relative to actions taken by a particular branch. In addition, SUP's constitution gives the headquarters the power to veto action taken individually by the other branches.

A sailor's membership in SUP is practically a prerequisite to employment on vessels as to which SUP holds collective bargaining contracts. It is important to note that jobs available to members of SUP are allocated on the basis of so-

called "shipping cards." Any member in good standing may apply for a shipping card. When issued, the cards are valid and the holder is entitled to be considered for employment or job placements, as requested by ship owners with whom the union holds collective bargaining agreements. The cards are current and valid for sixty days after issuance. By attending a branch meeting, a member may validate or keep his shipping card current beyond the initial sixty-day period. The member who holds the oldest current, valid shipping card (considering the date of its original issuance) is entitled to employment preference insofar as the filling or dispatching of jobs by SUP is concerned.

With these details as to the structure of SUP, and with the significance of membership therein in mind, we may now come closer to the circumstances which gave rise to this lawsuit. In May of 1949, and prior thereto, SUP was involved in a jurisdictional controversy with another maritime union known as the Canadian Seamen's Union (CSU). This controversy was an outgrowth of a union policy initiated by SUP and designed to expand its jurisdiction. The SUP expansionist policy appears to have been officially adopted by a majority of SUP's members at a convention held by the entire organization. Certain members, including John Mahoney, disagreed with the policy of expansion. To say the least, one rival union, the CSU, was not in favor of SUP's expansionist policy.

The CSU had had a collective bargaining agreement with the owners of a vessel known as the "Argojohn." In May, 1949, SUP, through the Seafarers' International Union of North America (SIUNA), an affiliate sponsored by SUP, negotiated a collective bargaining agreement with the particular shipowners to cover the employment of sailors with respect to the "Argojohn." The "Argojohn" went into dry dock on May 17, 1949, at the Todd Shipyards in Seattle, for extensive repairs. At that time, the ship was manned by members of SIUNA, although, as just pointed out, it had previously been manned by CSU members. At the time in question, the leaders of CSU had called a strike against

Canadian shipowners, including the owners of the "Argojohn."

When the "Argojohn" went into dry dock (May 17, 1949), a vessel known as the "American Mail" was moored at the Todd Shipyards in Seattle. SUP held a collective bargaining contract with the owners of the "American Mail." This contract contained a no-strike clause, which read as follows:

"Section 6: Strikes and lock-outs. There shall be no strike or shuttages of work during the period of this agreement for any cause."

In connection with the strike called by the leaders of CSU against the Canadian shipowners, picket lines were set up at the Todd Shipyards by CSU. It is a well-known fact that in labor circles and among active union members it is generally traditional (as the saying goes in labor-union parlance) to respect a picket line, and to refrain from work where a picket line exists. Unquestionably, confusion arises in a jurisdictional dispute between two unions, where both are seeking bargaining rights, where one union succeeds in obtaining a contract with an employer, but the other union refuses to concede and pickets the employer.

Such was the state of affairs when, as mentioned above, CSU set up the picket lines at the Todd Shipyards in Seattle; that is, a jurisdictional dispute existed between SUP and CSU, and there was much confusion in the minds of union men working at the Todd Shipyards. SUP, or its members, could do only one of two things, (a) they could disregard the picket lines, or (b) they could observe and respect the picket lines. The first alternative would be consistent with SUP policy to expand its jurisdiction and, also, would be consistent with what the majority of SUP members apparently regarded as their best interests. The other alternative, that is, a refusal of SUP members to cross the picket lines, their aiding or otherwise supporting the picket lines, would assist or at least support the position of CSU, the rival union. Other unions, whose members were employed directly by the Todd Shipyards in that company's operations and not as crewmen on the "Argojohn" or the "American Mail,"

were, as suggested above, also confronted with the problem as to whether their members should disregard the CSU picket lines. A large percentage of the seven hundred or more workmen employed at the Todd Shipyards refused to cross the CSU picket lines. *The officials of SUP and SIUNA, however, ordered their members to disregard the picket lines.*

The Todd Shipyards obtained a temporary restraining order, enjoining the picketing. Despite this, the picketing was continued by CSU until individual pickets were arrested and taken into custody. On May 23rd, the King county superior court permanently enjoined the picketing. Apparently, after some confusion and indecision, the employment or work of SIUNA and SUP crew members on the two vessels continued. Similarly, members of other unions resumed their work, and general operations of the Todd Shipyards, as well as repairs to the two above-mentioned vessels, were resumed.

John Mahoney and other members of the Seattle branch of SUP (apparently a minority of the total SUP membership) were opposed to the action taken by SUP headquarters whereby it was ordered that the CSU picket lines should be disregarded. This may have been because Mahoney and his group did not think SUP should expand its jurisdiction, because they preferred that the union should operate as it had in the past, because they wanted to assist the purported left-wing leaders of the CSU in the jurisdictional dispute with SUP, or because of other reasons, best known to members of this dissenting minority. *Whatever their reasons, their opposition was contrary to their union's policy* and to the specific orders from SUP headquarters implementing that policy.

In this connection, it should be pointed out that Mahoney had been an active member of SUP for a period of years and, frequently, had held office in the union. He was no babe in the woods as to labor union theory and practice. In fact, he was a well-informed, active, aggressive union man, thoroughly experienced and well trained in labor union policies, practices, and activities.

The facts show that the controversy between SUP and CSU, involving the "Argojohn" and the "American Mail," was discussed at meetings of the Seattle SUP branch on May 9, May 16, and May 23, 1949. The evidence is conflicting as to whether Mahoney was present at the meeting of May 9th. There is little dispute that he was present at the meetings of May 16th and May 23rd. There is some dispute as to whether he was present at the May 16th meeting at the particular time the "Argojohn" controversy was discussed. At the May 23rd meeting, John Mahoney was recognized by the chairman. He thereupon made certain remarks relative to the controversy between SUP and CSU, involving the "Argojohn" and the "American Mail," and the CSU picket lines at the Todd Shipyards. Based upon the remarks, the headquarters of SUP in San Francisco filed charges against Mahoney. Unquestionably, disciplinary action against Mahoney was contemplated. Mahoney received a written copy of the charges, which read as follows:

"We, the undersigned book members and officials of the Sailors' Union of the Pacific, hereby prefer charges against John Mahoney, Book No. 4344, for the following reason:

"Mahoney's scurrilous and defamatory remarks entered in the minutes of the Seattle meeting May 23, 1949, when John Mahoney 'wanted to know who gave the pie-cards the authority to engage in strike breaking activities and how come the membership of the organization were not kept advised of this' and also because of his remarks entered in the minutes of the Seattle meeing June 6, 1949, when Mahoney reiterated the same statement.

"The above are definite violations of the Constitution of the Sailors' Union of the Pacific which are listed as follows:

"1. Violation of the Obligation
"2. Violation of Article III, Section 4
"3. Violation of Article V, Section 1

"We hereby request that John Mahoney, Book No. 4344, appear before a trial committee at Headquarters in accordance with Article XIX, Section 1.

"[Signed] Wm. Mendez, No. 5059
    Albert Maniscalco, No. 4805
    Thomas Hookey, No. 3459
    George Kleist, No. 2807
    A. J. Pawlick, No. 2685

J. E. Pohorence, No. 2882
Harry Johnson, No. 3632
"Trial will be held at Headquarters (San Francisco) 10:00
a. m. July 5, 1949."

The SUP membership obligation and part of Article III,
§ 4, and Article V, § 1, of the union's constitution, referred
to in the written charges against Mahoney and allegedly
violated by him, read as follows:

"Obligation. I pledge my honor as a man, that I will be
faithful to this Union, and that I will work for its interest
and will look upon every member as my brother; that I will
not work for less than Union wages and that I will obey all
orders of the Union. I promise that I will never reveal the
proceedings of the Union to its injury or to persons not
entitled to know it. And if I break this promise, I ask every
member to treat me as unworthy of friendship and ac-
quaintance. So HELP ME GOD!"

"ARTICLE III. Membership. SECTION 4. . . . *Any
member who advocates and/or gives aid to the principles
and policies of any hostile or dual organization, or gives aid
or comfort to such, shall be denied further membership in
this Union.* . . .

"ARTICLE V. Duties of Members. SECTION 1. It shall be
the duty of each member to be true and loyal to the Union
and the labor cause, and to endeavor to put into practice
the principles laid down in the Preamble. *Members shall
treat the officers of the Union* while discharging their duties
*with due respect and consideration,* and *yield strict obedi-
ence to such rules as the Union may see fit to adopt.*" (Ital-
ics mine.)

Thereafter, at a regular meeting on July 5, 1949, the
Seattle branch, acting as a committee of the whole, re-
viewed the charges and exonerated Mahoney by an over-
whelming vote. Subsequently, this action by Seattle was
disapproved by all other SUP branches except Portland.
Mahoney did not appear for trial before the trial committee
at the headquarters in San Francisco. For some reason, the
date of his trial was continued to July 12, 1949, when he was
tried *in absentia,* convicted by the trial committee in San
Francisco, and was expelled from the union. All of the
branches except the Seattle and Portland branches con-
curred in the action of headquarters.

Thereafter, the rift between the Seattle branch and headquarters widened considerably. Statements were made, and articles highly critical of Mahoney appeared in SUP official publications. Numerous members of the Seattle branch rallied to Mahoney's defense. Funds were raised and a mimeographed publication called the "Defender" was distributed. The "Defender" supported Mahoney and countered the statements and articles appearing in SUP official publications by severely criticizing SUP officials for the action taken against Mahoney by the headquarters trial committee. At one stage of the fight, an attempt was made by both sides to compromise the difficulties. In this connection, Mahoney requested a new trial in San Francisco. Apparently the breach was too wide. The efforts to compromise failed. Headquarters denied a new trial.

During the controversy between Mahoney and SUP, there was a job to be filled on the "S. S. Baranof." The oldest valid shipping card in the Seattle branch at the time was held by Mahoney. Except for his controversy with the union, Mahoney claims that he would have secured the particular employment on the "Baranof." Because of his expulsion, the union did not refer Mahoney to the employer for the job. Another union member was dispatched by the union and obtained the employment. Mahoney's principal claim to damages is based upon the earnings he alleges he would have made, if expulsion had not prevented him from obtaining the job on the "Baranof."

The facts show that Mahoney had been involved in an accident aboard another ship, had brought a personal injury action against the vesssel's owners, and had made a compromise settlement for the not too inconsiderable sum of twenty thousand dollars, in May, 1949. Appellants contended in the trial court that the compromise of the personal injury lawsuit raised considerable doubt as to whether the vessel owners would have employed Mahoney, and as to whether he was physically fit to have accepted the employment on the "Baranof," even if the union had dispatched him for the job.

The trial of this case consumed approximately two weeks. The statement of facts is over thirteen hundred pages in length. There are forty-six assignments of error. The briefs of all parties total over four hundred pages. These factors alone, to say nothing of the complexity of the questions involved, indicate a task of no small proportions was imposed upon the trial court in disposing of this case. In passing, I express appreciation for the extensive memorandum opinion of the trial court, and the assistance it has given in analyzing the problems in this case.

In the trial court, in appellant's briefs and argument here, inferences have been advanced repeatedly that CSU is a left-wing communist-dominated labor organization. Obviously, the inference attempted is to the effect that Mahoney was in league with a subversive element in CSU, and that his conduct, encompassed by the union's charges, was in aid or support of a dual, subversive labor organization. As to this, the trial court, in its memorandum opinion, pointed out:

"In referring to the vast centralization of power in the hands of headquarters in this union, which is evident in its constitution, I do not imply that Mr. Lundeberg and his aides may not have believed that it was vital, to the advancement of the union, to suppress any opposition to their policies, but this does not make their acts valid. *Their counsel claim they were engaged in a life and death struggle with subversives. But, assuming this to be true, it did not justify resort to Fascist tactics. It may be that Mahoney and his supporters are radical malcontents who seek to disrupt the union. There was no proof they were,* but if they are they can be tried and expelled after notice and a fair trial, but certainly not otherwise. I do not see how any court of justice can condone the ruthless purge by which Mahoney and every one of his supporters who did not bow to ukase of the dictators at headquarters were cut off with such implacable fury as this record attests. The issues in evidence of the West Coast Sailor, the official publication of the union, make plain the fate that awaited the recalcitrant." (Italics mine.)

The trial court, among other things, found (a) that Mahoney had not made the specific statement which was at-

tributed to him in the union's charges, quoted above; (b) that, on May 23, 1949, at a regular meeting of the Seattle branch, ". . . John Mahoney, requested a point of information from the agent through the Chair, requesting to know 'who gave the officials or pie-cards the authority to send men through the Canadian Seamen's Union picket lines' "; (c) that Mahoney had not violated the provisions of the union's constitution, as charged; (d) that he should have been tried, if at all, in Seattle. In its judgment, dated January 4, 1952, the court ordered reinstatement and awarded damages to Mahoney in the sum of $3,533.63, plus interest. The judgment further provided:

". . . and plaintiff is further awarded judgment from said defendant at the rate of $453.90 per month, less any earnings he may have, from October 30, 1951, until such time as the judgment herein shall become final and absolute and that the Court at such time shall make such a determination as to said amount of additional judgment, and it is further

"ORDERED, ADJUDGED AND DECREED that the defendant Sailors Union of the Pacific be and it is hereby permanently enjoined from attempting to again expel plaintiff for any of the matters or things alleged in plaintiff's complaint and proven at the trial of this cause, or for plaintiff's attempt since the date of his alleged expulsion to gain reinstatement, and it is further

"ORDERED, ADJUDGED AND DECREED that plaintiff be and he is hereby awarded his costs and disbursements to be taxed herein."

Appellants' assignments of error relative to the findings of the trial court, designated above as (a), (b), (c), and (d), seem to me to be meritorious. In support of the assignments of error, the appellants contend that the controversy with Mahoney involved internal organizational policy matters; that the trial court had no authority to try the matter *de novo,* and was bound to accept the findings of the trial tribunal of the union, and was limited to an examination of the union's constitution and an inquiry as to whether Mahoney had been accorded all of his rights thereunder. Appellants urge that the charges against Mahoney were too narrowly construed by the trial court; that

Mahoney was charged in writing with making "scurrilous and defamatory" remarks in violation of the union constitution; that the written charges must be read or interpreted in context against the background of the jurisdictional dispute between SUP and CSU, the CSU's picket lines at the Todd Shipyards, and Mahoney's opposition to SUP's policy to exand its jurisdiction and his expert knowledge of union affairs, policies and procedure; that, in this connection, the validly adopted policy of SUP to compete with CSU for collective bargaining rights should be read into the charges against Mahoney.

It is the union's position that Mahoney's remarks at the May 23rd meeting, although superficially appearing to have been made to obtain information, actually were made, designedly, for another purpose, *i.e.,* to aid and support CSU, a rival union; that, as a practical matter, Mahoney knew all of the facts relative to the controversy between SUP and CSU, was aware of SUP's orders to its members—that the CSU picket lines at Todd's shipyards should be disregarded by SUP members. In other words, the union contends that Mahoney's remarks simply could not have been made for the purpose of obtaining information which was already in his possession and was also known to other members of the Seattle branch; that by making the particular remarks under the existing circumstances, Mahoney was urging Seattle branch members to actively oppose SUP policy, to the detriment of his own union and in aid of CSU, the rival union; that his action should not be characterized merely as discussion or an exercise of his right of free speech in a closed union meeting; that he asked a loaded question, knowingly and intelligently, for the purpose of getting members of the Seattle branch to respect the CSU picket lines, contrary to SUP policy and contrary to specific orders to SUP members from officials of the headquarters branch; that acquiescence of the Seattle members in Mahoney's plan would have stopped work indefinitely on the "Argojohn" and the "American Mail" by SUP members and by other union men; that the result would

have been a violation of SUP's no-strike, no-work-stoppage contract provision with the ship owners.

Appellants contend further that, under the union constitution, San Francisco was the proper place to try the charges; that Mahoney refused to appear for trial before the union's duly selected trial committee, thereby defaulting and waiving any rights he might otherwise have claimed; that the entire proceedings were regularly conducted and in order; and that the superior court for King county erred in ordering a reinstatement of Mahoney to membership and in awarding damages to him.

Mahoney contends that the authority of courts of law to review the evidence before a union trial committee and the action by that committee to expel a member from the union, should not be construed as narrowly as the union suggests; that he did not make the statement specifically attributed to him in the union's charges; that a preponderance of the evidence before the trial court supports a finding to the latter effect. He contends that he made a much less objectionable statement than the one charged; that a preponderance of the evidence supports the trial court's finding that he merely "requested a point of information from the agent, through the Chair, requesting to know 'who gave the officials or pie-cards the authority to send men through the Canadian Seamen's Union picket lines.'"

It is contended that the union is in the position of having charged him with making a specific remark, although the evidence supports the trial court's finding that a different remark was made; that the written charges against him must be construed strictly without any subtle inferences which possibly might be supplied by reference to the alleged background of the charges; that the remarks, as made by him, did not violate the union constitution; that the written notice of the charges received by him was indefinite and vague, and was inadequate to apprise him of the nature of the offenses charged. He further contends that his trial, if any, should have been in Seattle before a trial committee, selected from the membership of that branch;

that he was ready, able and willing to accept employment on the "Baranof," could and would have done so, except for his expulsion.

At this point, it seems pertinent to observe that organized labor has progressed a long way since the day when the efforts of workers to organize for the purpose of improving working conditions and wages were, sometimes, held suspect and were characterized by courts of law as conspiracies inimical to the public good, or were held to be actually criminal in nature. The acquisition of status and power by organized labor as an institution of our contemporary economic society has not been without a correlative assumption by labor or an imposition upon labor of definite responsibilities to society. In this connection, it may seem to some that at times the courts have been reluctant to remind labor organizations of their responsibilities to society, and that other branches of government have sought to avoid the necessity of doing so. However that may be, where circumstances warrant and the duty is clear, the courts must, do, and will act.

Nevertheless, in the process, there are inherent dangers. In other fields of judicial activity, there are decades and even centuries of experience. There are guiding principles and precedents, developed case by case over many years, involving close examination of various fields of human relations. In other fields, the courts, in making decisions, may refer to and rely upon a wealth of judicial knowledge and experience. The situation may be quite different where labor union controversies are concerned, involving as they do a variety of strained human relations, charged with dynamic, social and emotional content. In other words, in the evolving field of labor law, new and novel questions are often presented, and frequently decisions must be made without the help of precedent.

By way of comparison, problems which involve conflicting interests of majority and minority stockholders in a business corporation have a fairly extensive legal or judicial history. Perhaps as a result of this background, any natural or subjective tendency to view too sympathetically the cause

of the underdog, *i. e.*, minority stockholders, has given way to a more objective appraisal and recognition of the merits of majority rule, defining the latter in terms of the desirability of sound, efficient corporate business management as a worthwhile social objective. Because judicial history is not so extensive regarding conflicts between majority and minority membership groups of labor organizations, objectivity as to majority rule may be difficult, and the ascertainment of socially desirable results may not be so readily and clearly apparent. Unquestionably, in the instant case, this court is presented with a highly complicated labor union problem. Inherent in the disposition of the matter, feelings of uncertainty will not be alleviated, and the possibility of error will not be minimized, by the availability of numerous applicable, wise, and persuasive precedents. But this court should not permit misplaced sympathy or the psychology of protecting the underdog to confuse and to conceal the more important issues explicit in this appeal.

Obviously, to many individuals, the right to membership in a union is a very personal thing, tantamount to earning a living, to peace and security for themselves and their dependents, and deprivation of union membership is a serious matter. On the other hand, the orderly operation of a labor organization in the lawful furtherance of the proper interests of the majority of its members, the right of the majority of rank-and-file dues-paying members to vote or, through democratic processes, to formulate union policy and to implement such democratically determined policies, as well as the right of such a majority to discipline the dissenting members whose acts obstruct the lawful aims of the majority, are also matters of no small concern. See 21 A. L. R. (2d) 1397, Annotation: "Unfair or defective proceeding of labor union in expelling, suspending, or fining member as ground for judicial interference," § II.

A cursory examination of this case in the light of legal reasoning or standards usually applicable respecting criminal indictments and prosecutions could lead to affirmance of the disposition reached by the trial court. The same end result could be worked out if it is assumed that the basic

questions in the case involve solely the right of freedom of speech on the part of a union member at a closed meeting of his union, and his right to a fair trial before an impartial tribunal in connection with any action to expel him from the union.

On the other hand, if convinced there is more to this case than meets the eye, that other considerations are involved in addition to those outlined immediately above, that the basic questions in the case involve the right of the majority of rank-and-file dues-paying members to determine upon union policy and to discipline a dissenting minority member, not merely for debating or voicing opposition to such union policy in a closed union meeting, but for overt acts (a) *obstructing the policy* of his union, (b) *defying orders* of the officials of his union, and (c) *aiding* and *supporting* a *rival* Canadian union, then the trial court should be reversed.

I do not agree with the distinction made by the trial court between (a) the remarks as attributed to Mahoney in the union's charges and (b) the remarks which Mahoney admitted he made at the union meeting of May 23, 1949. Mahoney's version of the matter unquestionably is phrased in milder language. However, for all practical purposes, the effect of the two statements seems to me to be the same. In the one, the term "strike breakers" was used. Unquestionably the term is not one of endearment in labor circles. On the other hand in Mahoney's version of what he said, he merely questioned the action of the union *in ordering men to go through the CSU picket lines.* But the *crossing of picket lines* is regarded in labor circles as a *strike-breaking activity.* Consequently, irrespective of the manner in which *the crossing of picket lines* may have been referred to or characterized, the practical result of Mahoney's having made either statement was about the same. Furthermore, it seems to me a preponderance of the evidence would support a finding that something more tangible or overt than discussion, debate, or the exercise of freedom of speech in a closed union meeting, was implicit in the making of the remarks by Mahoney under the then existing circumstances.

Lifted out of context and considered abstractly, Mahoney's remarks at the May 23rd meeting (either version) may appear to add up to one thing, and a very innocuous matter at that. But the remarks, and the fact he made them in the charged atmosphere of the union meeting, under the then existing circumstances (involving the picket lines at the Todd Shipyards and the background thereof, with more than seven hundred union workmen in the Seattle area, including SUP members, confused and perhaps undecided as to whether they would disregard the CSU picket lines and continue working in the shipyards), add up to an entirely different proposition, in my judgment. As Mr. Justice Holmes once said (*Schenck v. United States,* 249 U. S. 47, 52, 63 L. Ed. 470, 39 S. Ct. 247):

"We admit that in many places and in ordinary times the defendants in saying all that was said in the circular [which had been mailed to men called and accepted for military service with the intent to influence them to obstruct the draft] would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. *Aikens v. Wisconsin,* 195 U. S. 194, 205, 206. *The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.* It does not even protect a man from an injunction against uttering words that may have all the effect of force." (Italics mine.)

In other words, it is one thing to strike a match and light a cigaret on the corner of Main street, but doing the same thing in a gunpowder factory is an entirely different matter.

My analysis of this case is that Mahoney's action and conduct in making the remarks at the May 23rd meeting must be described and placed in one of three categories: (1) He was merely requesting information; (2) he was merely *voicing* opposition to the SUP expansionist policy, hoping to change it through normal union procedures; or (3) he made the remarks to highlight to the members present the fact that he, Mahoney, was supporting the CSU picket lines in opposition to the orders from the headquarters branch (intentionally and designedly using superficially innocent and innocuous, yet nevertheless very effective,

union-meeting technique or group psychology to crystallize member support behind him and to mobilize support in the Seattle branch for the CSU picket lines); that in so doing, Mahoney was soliciting other members to actively help and support the rival union's picket lines, in open defiance and disregard of his own union's policy and best interests, in violation of union orders, in violation of the union's no-strike, no-work-stoppage contract with the "American Mail Line," and, possibly, in violation of court orders enjoining the CSU picketing.

I have considerable doubt as to whether conduct falling in categories (1) and (2), above, would constitute expellable violations under the union's constitution. However, it is not necessary to pass directly on such questions, because I believe that Mahoney's conduct falls in category (3), and, as such, that it constituted an expellable violation of the union's constitution. I am convinced that the evidence preponderates against the finding by the trial court, set out above, that Mahoney's conduct fell in category (1). As pointed out heretofore, Mahoney was an experienced, well-informed union member; he was a former official and a leader of considerable standing in his union. Among other things, the evidence strongly indicates that he was present at meetings of the Seattle branch on *May 9th* and *May 16th,* when the jurisdictional controversy between CSU and SUP, involving the "Argojohn," was discussed. In this and other respects, from the record evidence in the trial court, it is inconceivable to me that Mahoney lacked the precise information which his remarks purportedly solicited or sought from the chairman at the April 23rd meeting.

As a general proposition, I think that the right to membership in a labor union is so important that the concepts of fair play or due process of law, evolved so laboriously over a long period of Anglo-American legal history, should be kept in mind and carefully observed in connection with union trials involving the discipline of members. Among other things, generally speaking, this would seem to imply adequate notice of charges, an opportunity by an accused

to prepare for trial and to defend himself by testifying and producing witnesses and evidence in his behalf before an impartial tribunal. In this connection, it might be desirable procedure if legal principles applicable to the rights of an accused in a criminal trial were observed. But realistically, there are differences in the two kinds of proceedings, and I am not prepared to say that a union trial must be conducted with all of the particularity applicable to the rights of a defendant in a criminal prosecution. See 21 A. L. R. (2d) 1397, 1415, § 6.

I believe that the written union charges gave adequate notice to Mahoney to enable him to prepare for defense of the charges. This is particularly true in view of the facts pointed out heretofore, that Mahoney was an experienced labor man. It is fairly obvious that the union charges were not prepared by a lawyer but by union officials—perhaps, by the members of the trial committee selected by headquarters at San Francisco. Interpreted in view of the circumstances existing at the time, I think Mahoney could not have been under any reasonable misapprehension as to the charges, and should have realized that he was confronted with something much more serious than a charge that he had made certain specific remarks, had engaged in a discussion, or, as claimed by him, had merely exercised his right of freedom of speech. I note that it is not contended by Mahoney that any effort was made by him to have the union explain or amplify the charges.

As to the selection of a trial tribunal and the place of trial, the union constitution provides that a trial committee be selected and a trial be held in a port most convenient to the accused, the accuser, and the witnesses. Inconsistencies in this provision of the union constitution are so obvious that it is doubtful whether it could be strictly complied with in any event. In the instant case, the convenience of the accused may indicate Seattle as the place for selection of the trial committee and for the trial. The convenience of witnesses might better have been served if the choice had been in Seattle, but this is debatable. The convenience of the accusers certainly would indicate San Francisco. Mahoney

contends that his trial in San Francisco would have resulted in only one thing—conviction and expulsion. On the other hand, from the record, the union might very well have claimed that his trial in Seattle would have resulted in only one thing—exoneration and no expulsion.

Consideration of the particular provision of the union's constitution might very well result in a dilemma, except for certain facts which I regard as significant. Mahoney did not object to the composition of the trial committee on the ground of prejudice or bias of any of its members. He entirely ignored the notice for him to appear for trial in San Francisco. He now claims that his appearance there and any effort to defend himself there would have been useless and futile. I will not speculate as to this. A trip to San Francisco may have involved some personal expense to Mahoney and it is conceivable that he might not have been able to afford the extra expense of having numerous witnesses present in San Francisco, but their depositions might have been taken and made a part of the record before the union's trial committee, and without too much expense to Mahoney. SUP members work in and out of various ports. At the time of the union trial, Mahoney's witnesses might not have been in Seattle. They might have been in port in San Francisco or elsewhere. Mahoney chose to rely on his alleged right under the union constitution, to ignore the trial in San Francisco. He insisted that his problem should be worked out in the more friendly atmosphere of Seattle, where, understandably, he had reason to think the members of the Seattle branch would support his side of the controversy.

I think Mahoney should have stood trial in San Francisco, thus making his record in the union proceedings there. If that had been done, the record would be available for examination, and this court would not be in the position of having to speculate as to what might or might not have transpired there—particularly, as to whether his trial there would have been contrary to reasonable and judicially acceptable concepts of fair play.

It seems to me that the trial court interpreted the union's written charges too strictly, and that the charges and the provisions of the union constitution relative to giving aid and comfort to a hostile or dual union, disobedience of union rules or policies, must be construed against the background of facts and circumstances peculiar to the instant case. These facts and circumstances involve the jurisdictional dispute between the two unions, SUP's expansionist policy (approved by a majority of the members), the CSU picket lines at Todd Shipyards, SUP's orders to its members to ignore the picket lines, SUP's collective bargaining agreement with the owners of the "Argojohn" and the "American Mail," and lastly, Mahoney's knowledge and experience as an active, aggressive, well-informed member and ex-official of the Seattle branch of SUP. It is my view that SUP's written charges alleged a violation of the union constitution, and that a preponderance of the evidence before the trial court supports a finding or conclusion that Mahoney's conduct constituted a violation of the union constitution. The findings of the trial court to the contrary should be reversed.

In view of the disposition of the foregoing matters, as indicated herein, it is not necessary for me to consider the question of damages. However, in passing, I do make note of the facts in the record relative to Mahoney's compromise of his personal injury litigation for the not unsubstantial sum of twenty thousand dollars at a time, as claimed by him, when he was ready, willing, and *physically* able to accept employment as a sailor on the "S. S. Baranof." I also note the testimony of Mr. Zumdieck, an official of the company operating the "S. S. Baranof," to the effect that he would not have given Mahoney the job on the ship, if he had known Mahoney was applying for employment.

In my opinion, the judgment of the trial court should be reversed and the case dismissed.

SCHWELLENBACH, J., concurs with FINLEY, J.

---

April 1, 1954. Petition for rehearing granted.