[No. 32101. *En Banc.* October 25, 1954.]

JOHN MAHONEY, *Respondent,* v. SAILORS' UNION OF THE PACIFIC *et al., Appellants.*[1]

[1] Reported in 275 P. (2d) 440.

454

*Levinson & Friedman (Kneland C. Tanner,* of counsel), for appellants.

*Monheimer, Schermer & Mifflin,* for respondent.

*Bassett, Geisness & Vance, amici curiae.*

HAMLEY, J.—This case was argued first in Department and then reheard by the entire court. In an *En Banc* opinion, reported at 43 Wn. (2d) 874, 264 P. (2d) 1095, we affirmed the judgment for plaintiff. Thereafter, we granted a second rehearing *En Banc* to consider a jurisdictional question in the light of several Federal court decisions which have been reported since our opinion was filed.

Specifically, this question is whether the labor management relations act of 1947 (hereinafter referred to as the act), 61 Stat. 136 *et seq.*, 29 U. S. C. 1952 ed., § 141 *et seq.*, commonly known as the Taft-Hartley act, has given the national labor relations board (hereinafter referred to as the board) such exclusive jurisdiction over the subject matter of this action as to preclude the courts of this state from hearing and determining its issues.

The principal subject matter of this action is appellant union's asserted interference with, or deprivation of, Mahoney's right to obtain employment with certain employers.

In arguing that, under the facts of this case, the board has such exclusive jurisdiction over this subject matter as to preclude state action, appellants and *amici curiae* make these points: (1) If the union interfered with, or deprived Mahoney of, this right in the manner alleged, such conduct by the union was an unfair labor practice, within the meaning of the act; (2) such unfair labor practice, if any, affects commerce, as that term is defined in the act; (3) the board, in that event, was empowered to prevent such practice and grant affirmative relief; and (4) this being the case, state action has been superseded.

Relative to the first of these points, that is, whether the union's asserted interference with, or deprivation of, Mahoney's right to obtain employment was an unfair labor practice, several sections of the act have been called to our attention. Among these is § 8 (b), 29 U. S. C. 1952 ed., § 158 (b), which reads in part as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

"(2) to cause or attempt to cause an employer . . . to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues . . . uniformly required as a condition of . . . retaining membership."

The facts regarding Mahoney's expulsion from the union are fully set forth in the prior opinion. It is sufficient here

to say that his membership in the union was terminated on a ground "other than his failure to tender the periodic dues." He therefore is within the class of persons concerning whom an act of a union in causing or attempting to cause discrimination by an employer would be an unfair labor practice under the statute quoted above. It remains to be determined whether appellant union did cause or attempt to cause an employer to discriminate against Mahoney.

As to this, the facts appear to be about as follows: At the time Mahoney was expelled from the union, it had a collective bargaining agreement with Alaska Steamship Company and thirty-two other steamship companies, all of which operate vessels out of north Pacific ports. Under this contract, these employers agreed to recognize the union as the representative of their unlicensed deck personnel, for the purpose of collective bargaining. They also agreed that, in hiring employees in the classifications covered by the agreement, they would prefer applicants who had previously been employed on vessels of one or more of the companies signatory to the agreement.

The union agreed that, "in furnishing deck personnel" to employers "through the facilities of their employment office," it would recognize such preference and furnish seamen to the employers with due regard thereto and to the competency and dependability of the employees "furnished." The contract provides that, when an employer rejects men "furnished" who are considered unsuitable and unsatisfactory, it must furnish a statement in writing to the union stating the reason for the rejection. The union may thereupon refer the matter to the "port committee" for investigation, hearing, and adjudication. The port committee consists of six members, three appointed by the union and three by the employers.

Under the procedures and practices of the union pursuant to this contract, a union member who desires employment as a sailor with one of these employers registers at the union office and a shipping card is issued to him. At the time Mahoney was expelled, these cards were good for sixty

days. When this period had run, the cards expired, and holders desiring employment were required to reregister and receive a new card. If a member who holds such a card is absent from two consecutive union membership meetings, he must reregister and receive a new card, unless his absence is due to his employment.

When one of the employers needs an employee in this classification, it notifies the union office at the appropriate port. A union official then calls out the request. Those members present who are interested in the job submit their cards. The man whose card bears the oldest date is assigned to the job. He holds the job until he is discharged or quits.

Mahoney completed a job as maintenance man on the American Mail Line's SS "India Mail", about the middle of May, 1949. On July 18, 1949, before Mahoney had applied for a new shipping card, he was expelled from the union. He nevertheless applied for and received such a card on July 28, 1949. The union employee who issued this card testified that he did so because the action of the headquarters office (San Francisco) in expelling Mahoney had not yet been concurred in by the Seattle branch, and it was not then known what action other branches had taken.

On August 4, 1949, while Mahoney held this card, the Alaska Steamship Company requested the Seattle office of the union to furnish a man for a job on the SS "Baranof". Mahoney was qualified for this job and held the most eligible card for it. However, when he went to the union dispatcher for the assignment, the dispatcher said he would have to check the matter.

The Seattle office of the union then communicated with its San Francisco headquarters. The assistant secretary of the union handled the matter at San Francisco. He immediately advised the Seattle office that the shipping card had been issued to Mahoney under "duress" and "he is not entitled to ship." The Seattle office thereupon declined to assign Mahoney to the SS "Baranof", and a member in good standing got the job.

The union's shipping card and assignment procedures also operated to deprive Mahoney of the opportunity of finding employment with other employers. The trial court found that Mahoney has been denied permission to sail and is unable to obtain employment as a sailor upon any of the vessels shipping from Pacific coast ports.

We therefore conclude that appellant union, through its shipping card and assignment procedures, did cause employers to discriminate against Mahoney. Since such discrimination was with respect to an employee whose membership in the union had been terminated on a ground other than failure to tender periodic dues, it follows that such union procedures constituted an unfair labor practice, within the meaning of § 8 (b) (2) of the act, quoted above.

It is to be observed that this unfair labor practice consists not in Mahoney's wrongful expulsion from the union, but rather in the procedures followed by the union whereby employers were caused to discriminate against employees whose membership had been terminated on a ground other than failure to tender periodic dues. Thus, such union procedures would constitute an unfair labor practice even though Mahoney's expulsion had been valid.

This brings us to the second point advanced by appellants and *amici curiae*, as noted above; that is, that the unfair labor practice in question affects commerce, as that term is defined in the act. See 29 U. S. C. 1952 ed., § 152 (6) (7). This appears to be conceded by respondent.

As their third point, appellants and *amici curiae* argue that the board was empowered to prevent this particular kind of unfair labor practice and to grant affirmative relief.

The act provides that the board is empowered to prevent any person from engaging in any unfair labor practice affecting commerce. 29 U. S. C. 1952 ed., § 160 (a). The board is specifically authorized to issue and enforce, through court procedures, orders requiring persons to cease and desist from such unfair labor practices, and to take such affirmative action, including reinstatement of employees with or with-

out back pay, as will effectuate the policies of the act. 29 U. S. C. 1952 ed., § 160 (c), (e); *Born v. Laube*, 213 F. (2d) 407 (C. A. 9th, decided May 26, 1954); petition for rehearing denied *per curiam*, July 15, 1954, 214 F. (2d) 349; certiorari denied, 348 U. S. 855, 75 S. Ct. 80.

*Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. National Labor Relations Board*, 347 U. S. 17, 74 S. Ct. 323, provides a very recent example of the kind of relief the board can afford in a case such as this. The union had a collective bargaining agreement under which employers agreed, in filling vacancies in the position of radio officer, to select radio officers who were members of the union in good standing. The union wrongfully suspended one William C. Fowler, and notified the company which had offered him a job that Fowler was not in good standing with the union. Being unable to obtain union clearance on Fowler, the company gave the job to another man supplied by the union.

On the basis of charges filed by Fowler, the board issued a complaint against the union, conducted the usual proceedings, and issued an order requiring the union to cease and desist from the unfair labor practice. The union was ordered to notify Fowler and the company that it withdrew objection to his employment and to request the company to offer him employment. The union was also ordered to make Fowler whole for any loss of pay he might have suffered by reason of the union's acts. See 93 N. L. R. B. 1523, 1528, 1546.

Appellants and respondent appear to disagree as to whether the board is empowered to order a union to reinstate a member who has been wrongfully expelled. On this branch of the case, the question is not material, since, whether or not the board has that power, it does have power, as indicated above, to terminate the unfair labor practices and to grant affirmative relief. As before noted, the unfair labor practice consisted not in Mahoney's expulsion, but in the procedures and acts whereby the union caused employ-

ers to discriminate against an employee who had been expelled.

As their fourth and final point, appellants and *amici curiae* argue that, in view of points one to three, discussed above, state courts are precluded from granting relief as to the subject matter of the action which has been under discussion. We find this position well taken, both as to injunctive and compensatory relief.

■   If the acts complained of by an employer constitute an unfair labor practice affecting commerce, as defined in the act, then *injunctive* relief in state courts is precluded, unless such traditionally local matters as public safety and order and the use of streets and highways are involved. *Garner v. Teamsters, Chauffeurs & Helpers Local No. 776 (A.F.L.),* 346 U. S. 485, 74 S. Ct. 161; *Born v. Laube, supra.* The case before us does not involve a traditionally local matter, within the above statement of principle.

Under like circumstances, *compensatory* relief in state courts is also precluded if the act sets up a procedure under which compensation may be received. *Born v. Laube, supra.* In the *Born* case, the court was held to be without jurisdiction, because the act provides a procedure under which the plaintiff in that action could have obtained the compensatory relief which he sought—recovery of lost earnings.

*United Constr. Workers v. Laburnum Constr. Corp.,* 347 U. S. 656, 74 S. Ct. 833, relied upon by respondent, does not announce a different rule. In that case, the state court was held to have jurisdiction, because the act does not provide a procedure under which the plaintiff in that action could have obtained the compensatory relief which he sought— damages for loss of profits due to interference with the performance of the plaintiff's contracts. This distinction is pointed out in the *per curiam* opinion handed down in *Born v. Laube,* denying a petition for rehearing, 214 F. (2d) 349.

■   As before indicated, the act does provide a procedure under which appellant union can be required to compensate Mahoney for loss of earnings. We are therefore of the opin-

ion that, with respect to the principal subject matter of this action—appellant union's interference with, and deprivation of, Mahoney's right to obtain employment—the board has such exclusive jurisdiction as to preclude independent court procedures to obtain relief.

The trial court was therefore without jurisdiction to grant compensatory damages to Mahoney because of earnings lost by reason of the union's unfair labor practice. It was also without jurisdiction to order Mahoney's reinstatement in the union with all the rights and privileges of membership, in so far as such order was intended as a means of forcing the union to cease such unfair labor practice. See *Born v. Laube, supra.*

But there is another subject matter of this action which, though much less emphasized in the pleadings, evidence, and arguments, must also be considered.

In order clearly to present this matter, a brief review of the purport of our first opinion is necessary. It was established in that opinion that the action of the union in expelling respondent from the union was wrongful, because (1) the conduct of respondent which was given as the reason for the expulsion was not a violation of the union constitution for which he can be expelled; and (2) appellant union violated its constitution in conducting the trial at San Francisco instead of Seattle. No rehearing was granted as to these determinations, and they represent the established law of the case.

In that opinion, we held that respondent was entitled to redress against the union because of this wrongful act of expulsion, in view of the fact that it deprived him of a property right without due process of law. This was consistent with the position this court has always taken that application may be made to the courts to protect one's right to membership in a voluntary association, when pecuniary or property rights are involved. *State ex rel. Cicoria v. Corgiat,* 50 Wash. 95, 96 Pac. 689; *Ray v. Brotherhood of Railroad Trainmen,* 182 Wash. 39, 44 P. (2d) 787. In *Washing-*

*ton Local Lodge 104 v. International Brotherhood of Boilermakers, etc.*, 33 Wn. (2d) 1, 203 P. (2d) 1019, we said:

"Speaking generally, it is not within the province of the courts to regulate the internal affairs of labor unions or other voluntary organizations, but it is within the powers of the courts, and indeed it is their duty, to protect the property rights of the members of such organizations, when they are threatened and endangered, without specific charges and opportunity to be heard." (p. 74)

In applying this principle, we made reference in our first opinion to respondent's right to earn a livelihood as the property right being protected. In view of the recent Federal court decisions construing the act, noted above, we now feel that this particular property right, under the facts of this case, is not subject to protection in the courts of this state.

But respondent also asserts that the union's wrongful act in expelling him deprived him of other property rights which may only be protected in the courts of this state, and which this court has consistently protected in the past.

In respondent's amended complaint, it is alleged that, in addition to his right to earn a living as a sailor, he, as a member of the union, has valuable property rights in its treasury "to the same extent that each other member has" and in any other funds the union may have. In support of this allegation, testimony was received from a union official to the effect that dues are collected from members and are deposited in the union treasury; that the union has a health and welfare plan under which all members of the union in good standing are entitled to benefits; and that the union accords its members burial benefits amounting to one hundred twenty-five dollars.

The trial court entered a finding of fact which states in part that respondent, as a member of the union, has valuable property rights in its treasury, to the same extent that each other member has, and in any other funds the union may have. This portion of the findings of fact was not challenged by appellants, and so becomes an established fact of the case.

Unless our jurisdiction to protect property rights of the kind just mentioned has been superseded by the labor management relations act of 1947, referred to above, the courts of this state will do so. See *State ex rel. Cicoria v. Corgiat, supra; Ray v. Brotherhood of Railroad Trainmen, supra;* and *Washington Local Lodge 104 v. International Brotherhood of Boilermakers, etc., supra.*

Under the act, the board's authority, in so far as here pertinent, relates only to unfair labor practices, as defined in 29 U. S. C. 1952 ed., § 158. To remedy such practices, the board may require the union or employer to cease and desist, and may "take such affirmative action including reinstatement of employees with or without pay, as will effectuate the policies" of the act. 29 U. S. C. 1952 ed., § 160 (c).

█ Therefore, if the board has authority to order a union to reinstate an employee to union membership, it may do so only for the purpose of preventing unfair labor practices. But the act of a union in wrongfully expelling an employee from the union is not an unfair labor practice, as we have previously pointed out. Nor is it an unfair labor practice for a union, by wrongful expulsion or otherwise, to deprive an employee of his property and contract rights as a member of the union.

The act thus affords no remedy for one who has been wrongfully deprived of contract and property rights in the union by unlawful expulsion. Nor does the act express an intention that these rights should go unprotected. It follows that state court jurisdiction to protect such rights has not been superseded.

In exercising such jurisdiction, we are not called upon to surmise how the board would decide the question as to whether Mahoney's expulsion was valid or void. This is true because, under the facts of this case, the board would not be called upon to decide that question, and presumably would not decide it. As before indicated, the question of whether appellant union has been guilty of an unfair labor practice under the quoted portion of § 158 (b) (2) of the act

depends not at all upon the validity or invalidity of his expulsion.

Nor is the jurisdiction of this court to deal with the particular grievance now under discussion in any way affected by the fact that we may order the union to reinstate a member and the board may not, or vice versa. This court and the board each act with reference to the property right which it is authorized to protect. If the board determines that the property right to earn a livelihood does not require reinstatement in union membership, its determination is in no sense thwarted by a state court ruling that the same employee's property and contract rights as a member of the union require such reinstatement. The reverse is likewise true.

*Born v. Laube, supra,* does not stand for the proposition that there is a supersedure in connection with the particular property rights we are now discussing. The opinions in that case do not disclose whether the employee there sought to protect any property or contract rights in the union. There is no indication that any evidence was received, or finding made, concerning his rights to share in welfare, pension, or other benefit plans. He sought only to protect his right to earn a livelihood. Since this involved discrimination, which is defined in the act as an unfair labor practice, independent court action to protect that right was held to be superseded —as we likewise hold in this case.

It is true that *if* the board has power to order an employee's reinstatement in his union to prevent an unfair labor practice, and *if* the employee makes timely application to the board for such relief (the six-months time limit [29 U. S. C. 1952 ed., § 160 (b)] in the instant case expired in 1950), and *if* the board found the union to be guilty of an unfair labor practice, and *if*, as one remedy, the board then ordered the employee's reinstatement in the union, the employee might (or might not) find his property or contract rights in the union restored.

We do not believe, however, that the protection of respondent's property and contract rights in the union ought

to be left to this devious, highly uncertain, and in this case apparently foreclosed avenue of relief. The courts of this state have authority to provide a remedy and should not decline to act because of the possibility that some other agency may afford such relief as an incident to its own procedures.

In *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776 (A.F.L.)*, *supra*, the court observed that the act "leaves much to the states, though Congress has refrained from telling us how much." The court then said, with reference to the particular (and different) subject matter of that action:

"This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is 'governable by the State or it is entirely ungoverned.' *In such cases we have declined to find an implied exclusion of state powers. International Union v. Wisconsin Board*, 336 U. S. 245, 254, 69 S. Ct. 516, 521, 93 L. Ed. 651." (Italics ours.) (p. 488)

It is therefore our conclusion that the act does not preclude the courts of this state from ordering reinstatement of a union member where, as here, his wrongful expulsion is found to have deprived him of his property rights in the union.

The cause is therefore remanded, with directions to modify the judgment so as to declare the purported expulsion void and a nullity, and to order the union to forthwith reinstate Mahoney and to accord to him all his property rights as a member in such union, on the condition that he pay all dues and assessments now due and payable. The provision of the judgment enjoining the Sailors' Union from further attempts to expel plaintiff for acts committed prior to entry of the judgment and the provision regarding costs shall remain unchanged. In all other respects, the judgment under review is reversed. Appellants shall recover their costs in this court.

MALLERY, SCHWELLENBACH, HILL, DONWORTH, WEAVER, and OLSON, JJ., concur.

FINLEY, J. (concurring in part and dissenting in part)—The majority takes the position that the N.L.R.B. has exclusive jurisdiction to determine the question of whether the union committed an unfair labor practice entitling Mahoney to damages for loss of employment and wages. The portion of the judgment of the trial court awarding compensatory damages to Mahoney is reversed. I agree with this. However, the majority holds that the portion of the judgment of the trial court ordering the reinstatement of Mahoney to union membership is a matter within the jurisdiction of the trial court because reinstatement, in this instance, does not relate to discrimination in, or loss of, employment, but to an entirely different matter—namely, the protection of Mahoney's property rights in the funds, assets, or treasury of the union. I agree with the majority. The N.L.R.B. has no jurisdiction to order reinstatement of Mahoney for the purpose stated hereinbefore (protection of his property rights in the union's funds or treasury). For the reasons indicated in my dissent (43 Wn. (2d) 874, 264 P. (2d) 1095), I think Mahoney's expulsion was not improper, and I must disagree with the majority's affirmance of the trial court's judgment relative to this aspect of the case.