[L. A. No. 23005. In Bank. Jan. 16, 1958.]

J. S. GARMON et al., Respondents, v. SAN DIEGO BUILD-ING TRADES COUNCIL et al., Appellants.

596

Todd & Todd, Thomas Whelan, John T. Holt, Clarence E. Todd, Walter Wencke, Charles P. Scully, John C. Stevenson, Mathew Tobriner and Charles K. Hackler for Appellants.

Gray, Cary, Ames & Frye, James W. Archer and Ward W. Waddell, Jr. for Respondents.

SHENK, J.—This case is here for the second time. The first was on appeal from a judgment of the Superior Court in and for the County of San Diego ordering an injunction to prevent continuing conduct of the defendants found by the court to have been the cause of irreparable damage to the property and rights of the plaintiffs, and awarding $1,000 damages resulting from alleged past tortious activities of the defendants. The judgment was affirmed by this court on December 2, 1955. (*Garmon* v. *San Diego Bldg. Trades Council,* 45 Cal.2d 657 [291 P.2d 1].) On certiorari the Supreme Court of the United States ordered that the judgment of this court be "vacated" and the cause be remanded "for proceedings not inconsistent with this opinion and the opinions in *Guss* v. *Utah Labor Relations Board, supra* [353 U.S. 1 (77 S.Ct. 598, 1 L.Ed.2d 601)], and *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc., supra* [353 U.S. 20 (77 S.Ct. 604, 1 L.Ed.2d 613)]." (*San Diego Building Trades Council* v. *J. S. Garmon,* 353 U.S. 26 [77 S.Ct. 607, 1 L.Ed.2d 618].)

Both the Guss case (*Guss* v. *Utah Labor Relations Board*, 353 U.S. 1 [77 S.Ct. 598, 1 L.Ed.2d 601]) and the Amalgamated Meat Cutters case (*Amalgamated Meat Cutters* v. *Fairlawn Meats*, 353 U.S. 20 [77 S. Ct. 604, 1 L.Ed.2d 613]) were decided concurrently with the present case, March 25, 1957. They involved the exercise of jurisdiction by state agencies over labor disputes which substantially affected interstate commerce within the cognizance of the National Labor Relations Act. In the Guss case the Supreme Court held that the Utah Labor Relations Board had no jurisdiction to resolve a charge of unfair labor practice against an employer when the National Labor Relations Board had refused jurisdiction on the ground that the employer's operations were "predominately local in character." The court stated at page 602 that "the proviso to § 10(a) [formal cession of power to state agencies] is the exclusive means whereby States may be enabled to act concerning the matters which Congress has entrusted to the National Labor Relations Board." In the Amalgamated Meat Cutters case the Ohio court of Common Pleas asserted jurisdiction in a labor dispute, and the Supreme Court stated at page 606 that "If the proviso to § 10(a) . . . operates to exclude state labor boards from disputes within the National Board's jurisdiction in the absence of a cession agreement, it must also exclude state courts." In order that the present disposition of this case conform to the decision and order of the Supreme Court it is obvious that the judgment of the trial court herein, insofar as injunctive relief is concerned, must be reversed. In doing so it is deemed desirable if not necessary to review to some considerable extent what has taken place in the present proceeding.

As to the facts it appears that the plaintiffs are partners engaged in interstate commerce as retail dealers in lumber and other building materials; that their employees are not members of a labor union and had indicated that they do not desire to join, or to be represented by, a union; that the defendant unions had not been recognized by the plaintiffs nor certified by the National Labor Relations Board as the representatives of the plaintiffs' employees; that nevertheless the defendants demanded that the plaintiffs enter into an agreement which would require that all of the plaintiffs' employees be or become members of the defendant unions; that upon the plaintiffs' refusal to enter into such an agreement, on the ground that to do so would violate the law, the defendants placed pickets at the plaintiffs' place of business,

had the plaintiffs' trucks followed, threatened persons about to enter the plaintiffs' place of business with economic interference and injury, and that by such conduct they induced building contractors to discontinue their patronage.

The plaintiffs filed a petition with the National Labor Relations Board requesting that the question of its employee representation be resolved. The board refused to take jurisdiction. The refusal was based on the board's declared policy that the annual dollar amount of the plaintiffs' interstate business must but did not exceed a minimum set by the board. The present proceeding was commenced in the superior court for an injunction to prevent further alleged tortious conduct on the part of the defendants and for damages. The court found on substantial evidence that the intent of the defendants was not to induce the employees to join one of their unions, nor to provide education or information as to the benefits of organized representation; that their only purpose was to compel the plaintiffs to execute the agreement or to suffer the destruction of their business. The court enjoined the unions ". . . from picketing the places of business of plaintiffs, from following the trucks of the plaintiffs, from preventing or attempting to prevent, by means of threats, expressed or implied, persons having business with the plaintiffs from entering the premises of the plaintiffs, from inducing or attempting to induce by such means potential customers of plaintiffs to refuse to purchase from plaintiffs or to refuse to accept delivery of goods from plaintiffs or in plaintiffs' trucks, and from doing any other acts tending or intended to injure plaintiffs' business. . . ." The court also found that the plaintiffs' business had been damaged to the extent of $1,000 by the defendants' conduct and as stated, rendered judgment for that amount.

In affirming the judgment this court held that the National Labor Relations Board had jurisdiction to prevent unfair labor practices against employers engaged in interstate commerce; that the conduct on the part of the unions constituted unfair labor practices within the meaning of the Labor Management Relations Act (29 U.S.C., § 158); that in vesting in the National Labor Relations Board the discretion to accept or refuse jurisdiction of a controversy under section 10 of the act Congress must have intended that state courts should be free to act where the board had specifically determined, by refusing to accept jurisdiction, that the controversy did not have a pronounced impact on interstate commerce; that al-

though section 10(a) of the Taft-Hartley Act made provision for the National Labor Relations Board to cede, by agreement, jurisdiction to state agencies where the state law is not inconsistent with the national labor policy, Congress had not, by implication or otherwise, prohibited the state from assuming jurisdiction in the absence of such a cession and where the National Labor Relations Board had refused to take jurisdiction, and that the plaintiffs were entitled to injunctive relief and to the damages awarded by the state court.

In arriving at the foregoing conclusions this court took into consideration the fact appearing in the record that in the administration of the National Labor Relations Act the board had established certain standards as prerequisites to its assumption of jurisdiction. One essential was, of course, that the business of the enterprise must affect interstate commerce in a substantial way. But even when so affected the board's announced policy, for budgetary or other reasons, caused it to refuse jurisdiction in certain cases. This policy was declared by the board in its public announcement of October 6, 1950, that in order ". . . to better effectuate the purpose of the Act, and promote the prompt handling of major cases [the Board] has decided not to exercise its jurisdiction to the fullest extent possible under the Authority delegated to it by Congress, but to limit that exercise to enterprises whose operations have, or at which labor disputes would have, a pronounced impact upon the interstate flow of commerce wherever federal jurisdiction exists under the statute and the interstate commerce clause of the Constitution. . . ." Among the enterprises excluded were those which did not have a "direct inflow of material valued at $500,000 a year" or an "indirect inflow of material valued at $1,000,000 a year." (26 Labor Relations Reference Manual 50.)

The foregoing requirements were not altered by the board in a 1954 revision of its standards (34 Labor Relations Reference Manual 75) and were in force at the time of filing the plaintiffs' complaint. Pursuant to the standards set by those rules the remedy sought by the plaintiffs was excluded from consideration by the board for the reason that only $250,000 of the plaintiffs' required business during the preceding year was in interstate commerce. The plaintiffs were thus denied any redress before the board and were so notified. When the plaintiffs filed their petition with the board they received a reply stating: "The amount of business by Valley Lumber

Company [the plaintiffs' business title] in interstate commerce is insufficient for the Board to assert jurisdiction on the basis of present Board decisions.'' Later on, after investigation by the regional director of the board, the plaintiffs were notified that their petition had been dismissed with the statement that ''in view of the scope of the business operation involved, it would not effectuate the purposes of the National Labor Relations Act to institute further proceedings at this time. . . .''

The present situation of the plaintiffs therefore appears to be about this: Being in a business affecting interstate commerce their remedy by way of injunction is relegated to federal law and relief. Because their business in that category does not amount to $500,000 per annum they are caught in the vacuum. No federal judicial relief can be granted and in this ''no man's land'' no equitable relief can be granted by a state court. This unfortunate state of the law is recognized by the Supreme Court in both the majority and dissenting opinion in the Guss case. It is variously referred to as a ''vacuum'' or ''twilight zone'' or a ''no man's land'' in the law on account of which parties engaged in interstate commerce in a substantial amount but below the standards established by the board may not obtain equitable relief in state courts or other relief from the National Labor Relations Board however disastrously the alleged tortious conduct of the defendants may affect the plaintiffs' business.

We are, therefore, bound to conclude from the decisions of the Supreme Court that the plaintiffs are without equitable relief under federal law because Congress has occupied the field and, although the federal agency set up to adjust the controversy has failed to act, the state courts have no power to do so. In this connection the Supreme Court declared in the Guss case that the function of filling the gap, insofar as injunctive relief is concerned, is not judicial but legislative and must be performed by congressional enactment.

Whether the national board has the power to disclaim jurisdiction by a declaration of its policy appears not to have been judicially determined. The question was referred to in the Guss case by quoting from *Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U.S. 767 at page 776 [67 S.Ct. 1026, 91 L.Ed. 1234] as follows: ''The election of the National Board to decline jurisdiction in certain types of cases, for budgetary or other reasons presents a different problem which we do not now decide.''

We turn now to the question of damages awarded by the trial court. In remanding the present case the Supreme Court stated: ''Respondents, however, argue that the award of damages must be sustained under *United Construction Workers* v. *Laburnum Construction Corp.*, 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025]. We do not reach this question. The California Supreme Court leaves us in doubt, but its opinion indicates that it felt bound to 'apply' or in some sense follow federal law in this case. There is, of course, no such compulsion. Laburnum sustained an award of damages under state tort law for violent conduct. We cannot know that the California court would have interpreted its own state law to allow an award of damages in this different situation.'' The ''different situation'' referred to would seem to pose the question: Would this court interpret the California law to authorize an action for damages for the alleged unlawful tortious conduct of the defendants in the absence of violence? This question calls for an examination of the approach to the problem resulting in our former decision. From that examination it may be said that both the state and federal laws were relied on as establishing actionable conduct. Any distinction as between those laws was not thoroughly explored. It now appears that any reliance on federal law to justify the award for damages is not tenable under the facts of this case and we should now proceed to determine whether the plaintiffs have stated a cause of action for damages on account of the alleged past activities on the part of the defendants under state law.

It is apparent from the announcements of the Supreme Court as to the limitations on the jurisdiction of a state court to grant equitable relief in the solution of labor disputes that such courts are not foreclosed from asserting jurisdiction in an action for damages resulting from the tortious conduct of those engaged in the dispute. If the court had concluded that jurisdiction to award damages had been preempted by congressional legislation undoubtedly a declaration to that effect would have been forthcoming. In determining the jurisdiction intended by Congress to vest in the National Labor Relations Board the Supreme Court stated in *Garner* v. *Teamsters etc. Union,* 346 U.S. 485, at page 488 [74 S.Ct. 161, 98 L.Ed. 228]: ''The National Labor Management Relations Act, as we have before pointed out, leaves much to the states, though Congress has refrained from telling us how much.'' In view of the decisions of the Supreme Court holding that state agencies

and courts lack the jurisdiction to grant injunctive relief under any circumstances in interstate commerce cases, there would seem to be nothing left to the states if their courts are also prohibited from making an award for damages in a proper case.

In those cases where the Supreme Court has held that exclusive jurisdiction is vested in the National Labor Relations Board it appears without question that the basis of the decisions is the desirability of avoiding such a conflct between state and federal policies and procedural remedies as would result in an interference with uniform enforcement of the federal act. In *Garner* v. *Teamsters etc. Union, supra,* 346 U.S. 485, the court held at page 490 that Congress considered that centralization was necessary "to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures. . . ." The Garner case involved injunctive relief only. In the Laburnum case (*United Construction Workers* v. *Laburnum Construction Corp.,* 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025]) the action was one for compensatory and punitive damages arising out of unfair labor practices amounting to tortious conduct. As to the nature of the conduct there involved it appeared that agents of the labor unions "threatened and intimidated respondent's officers and employees with violence to such a degree that respondent was compelled to abandon all its projects in that area." After the Virginia Supreme Court of Appeals affirmed a modified judgment for damages the United States Supreme Court granted certiorari limited to the following question: ". . . does the National Labor Relations Board have exclusive jurisdiction over the subject matter so as to preclude the State Court from hearing and determining the issues in a common-law tort action based upon this conduct?" The petitioners contended in reliance on the Garner case that the federal government occupied the field so completely that state courts were "excluded not only from enjoining future unfair labor practices . . . but that state courts are excluded also from entertaining common-law tort actions for the recovery of damages caused by such conduct." The Supreme Court rejected this argument and distinguished the Garner case on the ground that the federal legislation was not applicable to damages for tortious conduct and that no interference with national policy could arise. The court stated: "In the Garner case, Congress had provided a federal administrative

remedy, supplemented by judicial procedure for its enforcement, with which the state injunctive procedure conflicted. Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result. The contrary view is consistent with the language of the Act and there is positive support for it in our decisions and in the legislative history of the Act.'' The court then further commented on its decision in the Garner case as follows: ''To the extent that Congress prescribed preventive procedure against unfair labor practices, that case recognized that the Act excluded conflicting state procedure to the same end. To the extent, however, that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated. The care we took in the Garner case to demonstrate the existing conflict between state and federal administrative remedies in that case was, itself, a recognition that if no conflict had existed, the state procedure would have survived. The primarily private nature of claims for damages under state law also distinguishes them in a measure from the public nature of the regulation of future labor relations under federal law.''

It is significant that the basis for the decision in the Laburnum case is that the remedy in damages for tortious conduct there involved did not conflict with federal legislation. It would seem necessarily to follow that the same conclusion would be reached in the case of an action for damages for any other tortious conduct which did not so conflict. The fact that the particular tort in the Laburnum case was said to be a common-law tort, or one involving physical violence, is, of itself, not controlling. To confine the Laburnum case to its own facts would be to completely ignore the rationale of the decision. It would require also that we ignore the language by which the present case was remanded for reconsideration. The Supreme Court, after stating that ''Laburnum was an award of damages under state tort law for violent conduct,'' then invited this court to examine its

state law to determine whether a cause of action for damages in tort could be maintained under that law in a situation which the Supreme Court referred to as "different." Certainly we cannot now refuse to apply our law merely because of the suggested difference. Again, if it had been the intent of the Supreme Court to limit jurisdiction to torts of violence an order of reversal and not an order of remand would also seem to have been appropriate as the record which that court had before it was devoid of any evidence of physical violence on the part of the defendants.

In considering the effect of the Laburnum case we are not alone in concluding that it is not to be confined to picketing accompanied by acts of violence. Following that decision a number of federal and state courts have affirmed judgments for damages in cases of tortious conduct differing from that in the Laburnum case but well within the rationale of that case. Most significant are those cases wherein, like the present one, only peaceful picketing was involved. In *Denver etc. Council* v. *Shore,* 132 Colo. 187 [287 P.2d 267], it was claimed that the Laburnum case was distinguishable on the ground that violence was there involved. The Colorado Supreme Court held that this "is scarcely a proper basis for distinction as it goes not to the principle involved, but only to the extent of damage that might be properly determinable. Admitting that in the Laburnum case the tort was excessive and that in the present case it was mild and devoid of any rowdyism, nevertheless, in either case a recovery in damages for injury done on account of the illegal practice is necessarily upon the basis of tort." (See also *Benz* v. *Compania Naviera Hidalgo, S. A.,* 353 U.S. 138 [77 S.Ct. 699, 1 L.Ed.2d 709]; *Dallas General Drivers* v. *Wamix, Inc., of Dallas,* (Tex.Civ.App.) 281 S.W.2d 738, 745; *Benjamin* v. *Foidl,* 379 Pa. 540 [109 A.2d 300, 301]; *International Sound Technicians* v. *Superior Court,* 141 Cal.App.2d 23 [296 P.2d 395]; *Selchow & Righter Co.* v. *Damino,* 146 N.Y.S.2d 874.)

In accordance with the views expressed by the Supreme Court in the Laburnum case, and the court's reference thereto in remanding the present case, the question next for consideration is whether the alleged conduct of the defendants was unlawful under the laws of this state and an actionable tort within the jurisdiction of its courts. If the purpose of the defendants' picketing was unlawful under the state law the case cannot be distinguished from the Laburnum case and

the other state and federal cases to the same effect as to the jurisdictional issue.

The law of this state imposes upon everyone the duty "to abstain from injuring the person or property of another, or infringing upon any of his rights." (Civ. Code, § 1708.) There is a breach of such legal duty when one who performs an act not authorized by law infringes upon a right another is entitled to enjoy, or causes a substantial material loss to another. That breach constitutes the commission of a tort, under the laws of this state, for which an action in damages will lie. In *Loup* v. *California S. R. R. Co.*, 63 Cal. 97, it was said at page 99: "A person commits a tort, and renders himself liable to an action for damages, who commits some act not authorized by law, or who omits to do something which he ought to do by law, and by such an act or omission either infringes some absolute right, to the enjoyment of which another is entitled, or causes to such other some substantial loss of money, health, or material comfort." (See also 24 Cal.Jur. 589.) It is further established in this state that by an unlawful and unauthorized labor practice an employer who is damaged thereby may recover damages in a tort action. In *James* v. *Marinship Corp.*, 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], it was said that the "object of concerted labor activity must be proper and that it must be sought by lawful means, otherwise the persons injured . . . may obtain damages . . . (Citations.)" (See also *Park & T. I. Corp.* v. *International Brotherhood of Teamsters*, 27 Cal.2d 599, 603 [165 P.2d 891, 162 A.L.R. 1426].)

There is then the further question whether the objective of the defendant unions was a proper and lawful one. Section 923 of the Labor Code, as enacted in 1933 (Stats. 1933, p. 1478) and reenacted in 1937 (Stats. 1937, p. 208), provides as follows: "In the interpretation and application of this chapter, the public policy of this State is declared as follows: Negotiations of terms and conditions of labor should result from voluntary agreement between employer and employees. . . . [I]t is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or pro-

tection.'' Section 1667 of the Civil Code, enacted in 1872, provides: ''That is not lawful which is: . . . Contrary to the policy of express law though not expressly prohibited. . . .''

In the present case the court found, in accordance with the allegations of the complaint, that in order to achieve an unlawful objective the defendants had made a demand on the plaintiffs that they execute the contract and concluded that the demand, if complied with, would constitute an unlawful interference with the bargaining rights of the plaintiffs' employees. Such conduct on the part of the defendants was directly contrary to the policy of the state as set forth in section 923 of the Labor Code above quoted. The trial court correctly concluded from the evidence that by their demand the defendants sought to require the plaintiffs to interfere with the bargaining rights of their employees and force upon them terms and conditions of their employment and labor representation not of their own choosing and which in fact they had rejected. If the plaintiffs had acceded to the demand of the defendants a definite case of coercion on the part of the plaintiffs with respect to the bargaining rights of their employees, contrary to law, would have been accomplished.

After the decision of this court in *McKay* v. *Retail Auto. S. L. Union No. 1067*, 16 Cal.2d 311 [106 P.2d 373], the Legislature in 1947 enacted the Jurisdictional Strike Act. (Stats. 1947, pp. 2952-53.) That enactment is incorporated in the Labor Code as sections 1115 to 1120 inclusive. Section 1118 defines a jurisdictional strike not only as a ''concerted refusal to perform work for an employer'' but also as ''any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer.'' Section 1115 states that a jurisdictional strike ''as herein defined is hereby declared to be against the public policy of the State of California and is hereby declared to be unlawful.'' Section 1116 provides that ''any person injured or threatened with injury by violation of any of the provisions hereof shall be entitled to injunctive relief therefrom in a proper case and to recover any damages resulting therefrom in any court of competent

jurisdiction.''* Section 1117 defines a "Labor organization" as "any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work. . . . As used herein, 'person' means any person, association, organization, partnership, corporation, unincorporated association, or labor organization."

In the present case it does not appear clearly whether the plaintiffs' employees had or had not selected a committee or unit or other agency for the purpose of collective bargaining. However, it does appear that they preferred to deal directly with their employers pursuant to their individual bargaining rights. If they had exercised their rights under the law and chosen to deal with their employers through some committee or organization they would have come directly within the provisions of the Jurisdictional Strike Act.

The foregoing provisions of the Labor Code, that is, sections 923 and 1115 through 1118, are *in pari materia* in that they relate to the same general subject and should be considered together. They all represent an endeavor on the part of the Legislature to safeguard the rights of the individual workman and the employer in this important field of labor-management relationships.

The question of the constitutionality of the provisions of the Jurisdictional Strike Act came before this court in *Seven Up etc. Co.* v. *Grocery etc. Union* (1953), 40 Cal.2d 368 [254 P.2d 544, 33 A.L.R.2d 327]. By the complaint the plaintiff sought an injunction and damages for the alleged unlawful conduct of the defendants. At the trial the defendants objected to the introduction of any evidence on the ground that the complaint did not state facts sufficient to constitute a cause of action. The objection was sustained and from a judgment dismissing the action an appeal was taken. It was contended by the defendant unions that the act was unconstitutional on the ground that under the guaranties of freedom

---

*Federal legislation to the same effect is found in section 303(a)(4) (29 U.S.C.A., § 187[a][4] of the Labor Management Relations Act (61 Stat. 158) prohibiting jurisdictional strikes, and section 303(b) (29 U.S.C.A., § 187[b]) authorizes an action for damages for violation thereof. A judgment for damages for violation of that provision was rendered by the District Court for the Territory of Alaska, affirmed by the Court of Appeals for the Ninth Circuit (*International Longshoremen's, etc. Union* v. *Juneau Spruce Corp.*, 189 F.2d 177), and affirmed by the Supreme Court in 1952 (*International Longshoremen's etc. Union* v. *Juneau Spruce Corp.*, 342 U.S. 237 [72 S.Ct. 235, 96 L.Ed. 275]).

of speech "the picketing was lawful, and the act, therefore, in condemning concerted interference with the employer's business, is invalid, because it deprives them of the right to engage in lawful concerted action, that is, peaceful picketing; that such activity does not create a 'clear and present danger' justifying a restraint on the freedoms mentioned."

By unanimous opinion of this court it was held that the legislation under attack did not infringe upon the constitutional rights of free speech. There was no allegation in the complaint that interstate commerce was involved. It was pointed out that although "Peaceful picketing has been identified with freedom of speech —a means by which the pickets communicate to others the existence of a labor controversy," nevertheless the identification of peaceful picketing with freedom of speech did "not free the concerted activity of picketing from all restraint." (See also *Northwestern Pac. R. R. Co.* v. *Lumber & S. W. Union,* 31 Cal.2d 441 [189 P.2d 277].)

 Based on the foregoing provisions of the statutory law of this state and the finding and conclusion of the trial court, which is amply supported by the evidence, that the only purpose of the defendants' activities was to compel the plaintiffs to execute the proposed agreement, we are bound to conclude that the conduct of the defendants constituted an unlawful labor practice contrary to and in violation of the laws of this state.

Apart from the question of the existence of an actionable tort based upon an unlawful labor practice under state law is the question whether any limitation placed on peaceful picketing constitutes an undue interference with personal liberties protected by the First and Fourteenth Amendments. After the decisions of the Supreme Court in the Guss case, in the Amalgamated Meat Cutters case, and in this case, all on March 25, 1957, the Supreme Court in *International Brotherhood of Teamsters* v. *Vogt, Inc.,* 354 U.S. 284 [77 S.Ct. 1166, 1 L.Ed.2d 1347] (June 17, 1957) entered upon an extensive review of its decisions involving peaceful picketing. It was there said at page 1166: "This is one more in the long series of cases in which this Court has been required to consider the limits imposed by the Fourteenth Amendment on the power of a State to enjoin picketing." After reviewing those cases the court stated at page 1171: "This series of cases, then, established a broad field in which a State, in

enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy.'' Among those local policies which the court deemed to be proper objectives for state action was that which, as in the present case, made it unlawful to coerce an employer to put pressure on his employees to join a particular union. The court commented on *Pappas* v. *Stacey,* 151 Me. 36 [116 A.2d 497], where it appeared that union employees picketed a restaurant peacefully ''for the sole purpose of seeking to organize other employees of the Plaintiff, ultimately to have the Plaintiff enter into collective bargaining and negotiations with the Union. . . .'' The Maine Supreme Judicial Court had drawn an inference from an agreed statement of facts that ''there is a steady and exacting pressure upon the employer to interfere with the free choice of the employees in the matter of organization. To say that the picketing is not designed to bring about such action is to forget an obvious purpose of picketing—to cause economic loss to the business during noncompliance by the employees with the requests of the union.'' The trial court held the conduct to be in violation of a Maine statute which provided as follows: ''Workers shall have full freedom of association, self organization and designation of representatives of their own choosing for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection, free from interference, restraint or coercion by their employers or other persons. . . .'' (P.L. 1941, ch. 292; R.S., ch. 30, § 15 (1954).) The United States Supreme Court dismissed an appeal in the Stacey case because it presented no substantial federal question. (*Stacey* v. *Pappas,* 350 U.S. 870 [76 S.Ct. 117, 100 L.Ed. 770].) The Vogt case presented a similar problem and while the Supreme Court said that it ''might well have denied certiorari on the strength of our decision'' in the Stacey case it nevertheless ''thought it advisable to grant certiorari . . . and to restate the principles governing this type of case.''

In the Vogt case, as in the Stacey case, the problem involved pressure brought to bear against an employer through peaceful picketing in an attempt to coerce him to influence his employees to join a labor organization. The Supreme Court of Wisconsin had stated that ''One would be credulous indeed to believe under the circumstances that the Union had no thought of coercing the employer to interfere with its em-

ployees in their right to join or refuse to join the defendant Union.'' As in the Stacey case the Wisconsin court held that such picketing was for an unlawful purpose and in violation of a Wisconsin statute which made it an unlawful labor practice for an employee individually or in concert with others to ''coerce, intimidate or induce any employer to interfere with any of his employes in the enjoyment of their legal rights . . . or to engage in any practice with regard to his employes which would constitute an unfair labor practice if undertaken by him on his own initiative.'' (Wis. Stat., § 111.06(2) (b).) In the Vogt case the Supreme Court, again referring to the Stacey case said: ''The Stacey case is this case . . . As in Stacey, the highest state court [of Wisconsin] drew the inference from the facts that the picketing was to coerce the employer to put pressure on his employees to join the union, in violation of the declared policy of the State. (For a declaration of similar congressional policy, see § 8 of the Taft-Hartley Act, 61 Stat. 140, 29 U.S.C. § 158, 29 U.S.C.A. § 158.) The cases discussed above all hold that, consistent with the Fourteenth Amendment, a State may enjoin such conduct.'' (See also *United Assn. of Plumbers etc. Union* v. *Graham*, 345 U.S. 192 [73 S.Ct. 585, 97 L.Ed. 946]; *Building Service etc. Union* v. *Gazzam*, 339 U.S. 532 [70 S.Ct. 784, 94 L.Ed. 1045].)

The present case is the same in all essential respects as the Stacey and Vogt cases, with the single exception that in those cases interstate commerce was not involved and thus the question of encroachment on the jurisdiction of the National Labor Relations Board was not at issue. However, those considerations which go to the existence of a cause of action for tortious conduct in violation of the declared policy of a state are the same. Not only are the declared policies of Maine and Wisconsin identical in all material aspects with the law of California, but the manner in which those laws were violated and thus gave rise to an actionable tort cannot be distinguished.

The United States Supreme Court, in its majority opinion in the Vogt case, pointed out that there had thus been a gradual transition from the premise that peaceful picketing was an absolute right (see *Thornhill* v. *Alabama* (1939), 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]), and that it is now universally recognized that there is something more in peaceful picketing than merely the communication of ideas or free speech entitled without qualification to First Amendment pro-

tection. (See *Bakery & P. Drivers etc. Local* v. *Wohl,* 315 U.S. 769, 776-777 [62 S.Ct. 816, 86 L.Ed. 1178].) The court in the Vogt case noted that the cases in this field disclosed "an evolving, not a static, course of decision," and that the doctrine of a particular case "is not allowed to end with its enunciation. . . ." It traced the evolution of the law in this field from the Thornhill case which had been deemed to accord to peaceful picketing unqualified First Amendment protection, to its present holding that the intervening cases "established a broad field in which a State, in enforcing some public policy . . . could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy."

Mr. Justice Douglas in the dissenting opinion in the Vogt case summarized the evolution of the court's decisions dealing with the legal principles here involved since the Thornhill case. In criticizing the majority opinion he said that "The Court has now come full circle"; that the "retreat began when, in *International Brotherhood of Teamsters, C. W. & H. Union* v. *Hanke,* 339 U.S. 470 [70 S.Ct. 773, 94 L.Ed. 995, 13 A.L.R.2d 631], four members of the Court announced that all picketing could be prohibited if a state court decided that that picketing violated the State's public policy. The retreat became a rout in *Local Union No. 10, United Asso. J. P. & S.* v. *Graham,* 345 U.S. 192 [73 S.Ct. 585, 97 L.Ed. 946]. It was only the 'purpose' of the picketing which was relevant. . . . Today, the Court signs a formal surrender . . . State courts and state legislatures are free to decide whether to permit or suppress any particular picket line for any reason other than a blanket policy against all picketing."

The majority of the Supreme Court by its latest decisions has thus defined and clarified the limitations which a state may constitutionally place upon peaceful picketing conducted in the asserted exercise of the right of free speech as contemplated by the First and Fourteeenth Amendments. That court has unequivocally held that there may be something more in peaceful picketing than free speech, depending on the facts of the case, and that conduct in the exercise of the asserted right is subject to regulation in accordance with a valid state policy in cases where interstate commerce is not involved.

In view of the development and recent clarification of the law in this field we are requested to reconsider the case of *McKay* v. *Retail Auto. S. L. Union No. 1067, supra,* 16 Cal.2d 311. That case in legal contemplation is similar to the present

case but there was no showing there that the employer corporation was engaged in interstate commerce and there was no request for damages. It appeared, however, that the controversy was between two labor organizations as to which had "or should have the exclusive right to have its members perform work for an employer." (Lab. Code, § 1118.) The picketing was peaceful. The employer took no part in the controversy. It could not, under the law, interfere. It was caught in the middle and according to the admitted facts "the continuance of the picket lines [had] the effect of closing down the company's plant, stopping all work therein and destroying its said business."

The McKay case was decided on October 14, 1940. It was held that the picketing without violence there engaged in was entitled to protection under the federal constitutional right of freedom of speech. This declaration was made notwithstanding the provisions of section 923 of the Labor Code, adopted in 1933, declaring the policy of the state and above quoted. That section was referred to in the majority opinion but only as to its ineffectiveness as against the constitutional rights of the defendants.

We deem it unnecessary to reconsider the McKay case for the reason that the result sought by the request has already been accomplished, first, by the enactment by the Legislature of the Jurisdictional Strike Act in 1947 making the activities of the defendants in the McKay case unlawful with redress by way of injunctive relief and damages; secondly by the decision of this court in the first Seven Up case in 1953 (*Seven Up etc. Co.* v. *Grocery etc. Union, supra,* 40 Cal.2d 368) establishing the constitutionality of that act as valid state law, and finally by the Supreme Court of the United States in the Vogt case (*International Brotherhood of Teamsters* v. *Vogt, Inc.* [June, 1957], *supra,* 77 S.Ct. 1166) in affirming jurisdiction in the state court to enforce such a state policy either by injunction or damages, or both, when interstate commerce is not involved. The McKay case, on its facts, would fall within the regulatory provisions of the Jurisdictional Strike Act, later enacted. It was undisputed in that case that the controversy was between two labor organizations. The effect of later statutes and decisions on that case may well be left for further judicial consideration when the same or similar facts are presented.

It would also serve no useful purpose to review the numerous other decisions of this court cited by the parties and prior

to the latest expressions of the Supreme Court of the United States in clarifying the decisional and other law in this field of labor-management relations, and in making clear the extent of the power of the state courts to exercise jurisdiction in proper cases, both in law and in equity. Those decisions have been superseded, in many respects, by later law both statutory and decisional. To engage in the task of distinguishing and discussing them now would be a work of supererogation. Whether they are or are not consistent with present law may also be more appropriately pointed out as questions with reference thereto are presented.

The defendants contend that the trial court was without jurisdiction to award damages in this case for the reason that the amount of the damages alleged and awarded was less than the amount necessary to confer superior court jurisdiction. The complaint alleged past damages in the sum of $750 and future damages in the sum of $150 a day in addition to the loss of contracts. Irreparable injury was alleged. Both injunctive relief and damages in the sum of $1,000 were awarded. The court correctly assumed jurisdiction to hear and decide the case as to both issues. The fact that equitable relief is ultimately denied does not destroy the judgment as to the award of damages even though the award was below the jurisdictional amount otherwise necessary. In *Silverman* v. *Greenberg,* 12 Cal.2d 252, it was said at page 254 [83 P.2d 293] : "The allegations of the pleading and the relief sought established the character of the action. The fact that it was substantially of an equitable as well as of a legal nature invested the superior court with jurisdiction to hear and determine the entire cause, and that jurisdiction was not divested by the subsequent denial of equitable relief. The court of equity having once obtained jurisdiction, properly retained the case and decided the whole controversy between the parties. For a complete discussion of this subject see *Becker* v. *Superior Court, supra* [151 Cal. 313 (90 P. 689)]; also *Cook* v. *Winklepleck, supra,* [16 Cal.App.2d Supp. 759, 763 (59 P.2d 463)] and cases there cited."

There is substantial evidence to support the amount of damages awarded.

In summary, it is concluded that the injunctive relief sought by the plaintiffs is not, under the facts of this case, within the jurisdiction of the superior court to grant; that the policy declared by the Legislature of the state concerning coercive conduct between employer and employee as to whether the

employee should or should not join a particular union is a valid state policy and activities contrary thereto are unlawful; that such policy is in all essential respects the same as that declared by the legislatures of Maine and Wisconsin and held to be valid in the Stacey case (*Stacey* v. *Pappas, supra,* 350 U.S. 870) and the Vogt case (*International Brotherhood of Teamsters* v. *Vogt, Inc., supra,* 77 S.Ct. 1166) respectively; that, as in those cases, such policy is violated by bringing pressure to bear against an employer to coerce his employees to join or not to join a particular union; that the conduct of the defendants in the present case was contrary to that policy and for that reason unlawful and tortious; that the plaintiffs were entitled to maintain this action for damages resulting therefrom, and that the trial court had jurisdiction to award such damages. These conclusions are deemed to be consistent with the opinion and order of the Supreme Court in remanding this proceeding.

The judgment, insofar as it awards injunctive relief, is reversed. Insofar as it awards damages to the plaintiffs the judgment is affirmed, with costs to neither party in the present proceeding.

Schauer, J., Spence, J., and McComb, J., concurred.

TRAYNOR, J.—I dissent.

The United States Supreme Court remanded this case for a determination of the question whether plaintiffs have a cause of action under state law. The majority of this court now state that it is apparent from the remand that restrictions on the power of state courts to enjoin conduct that is an unfair labor practice are not applicable to an action for damages, and that if we did not have power to award damages, the Supreme Court would no doubt have so declared rather than remanded the case. The remand cannot bear such a construction. In its opinion, the Supreme Court specifically states that it does not reach the question whether an award of damages can be sustained under *United Construction Workers* v. *Laburnum Construction Corp.,* 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025]. The court did not find it necessary to decide this question since our earlier opinion in the case did not state whether plaintiffs have a cause of action under state law. If no cause of action for damages exists under state law, it is of course immaterial whether the policy of the federal statute does or does not permit the enforcement

of such a cause of action in the state courts. The Supreme Court, pursuing its usual policy of judicial economy, declined to answer a problem when an answer was not strictly compelled. Whatever we may think of the wisdom of this policy, considering the burden it places on litigants and the lower courts, it furnishes a complete explanation for the remand in the present case. Except insofar as earlier decisions of the Supreme Court provide guidance, the question is still open whether a state court has jurisdiction to award damages in the kind of case now before us.

Soon after *Garner* v. *Teamsters etc. Union*, 346 U.S. 485 [74 S.Ct. 161, 98 L.Ed. 228], the Supreme Court qualified the broad rule of that case in *United Construction Workers* v. *Laburnum Construction Corp.*, 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025]. There the defendants employed threats of violence and an armed mob in an effort to compel the plaintiff to recognize them as the exclusive bargaining representative of its employees. The Supreme Court upheld state court jurisdiction to award damages for the injury to the employer's business resulting from such conduct, in spite of the assumption that it was also an unfair labor practice under section 8(b)(1). (29 U.S.C. § 158(b)(1).)

Language in the opinion suggested that jurisdiction to apply state law was preserved because the plaintiff sought damages rather than an injunction and that the case was distinguishable from the Garner case because there state law attempted to provide a preventive remedy paralleling the preventive remedy available under federal law, whereas "here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct." (347 U.S. at 663-664.) Some state and federal cases have relied on this distinction in holding that damages may be awarded under state law for conduct markedly different from that in the Laburnum case. (*Benz* v. *Compania Naviera Hidalgo, S.A.*, [9th Cir.], 233 F.2d 62, 65-66, rev'd on other grounds, 353 U.S. 138 [77 S.Ct. 699, 1 L.Ed.2d 709] [peaceful picketing constituting tort under Oregon law]; *Denver Bldg. & Constr. Trades Council* v. *Shore*, 132 Colo. 187, 196-197 [287 P.2d 267] [peaceful picketing in violation of Colorado Labor Peace Act]; *Benjamin* v. *Foidl*, 379 Pa. 540 [109 A.2d 300] [common-law conspiracy to deprive of employment]; *Dallas General Drivers* v. *Wamix, Inc.* (Tex.Civ.App.), 281 S.W.2d 738, 745-746, aff'd on other grounds, —— Tex. —— [295 S.W.2d 873] [peaceful picket-

ing and secondary boycott in violation of Texas antitrust and antimonopoly statutes] ; see *International Sound Technicians* v. *Superior Court,* 141 Cal.App.2d 23, 29-32 [296 P.2d 395] ; *New York, New Haven & Hartford R. R.* v. *Jenkins,* 331 Mass. 720, 734-735 [122 N.E.2d 759], rev'd sub nom. *Local 25, Int'l Brotherhood of Teamsters* v. *New York, New Haven & Hartford R. R.,* 350 U.S. 155 [76 S.Ct. 227, 100 L.Ed. 166] ; *Selchow & Righter Co.* v. *Damino,* 146 N.Y.S.2d 874, 876-877 [Sup.Ct.].)

Relying on this same analysis, other courts in actions by employees against unions have refused to award damages under state law on the ground that the National Labor Relations Board was empowered to give substantially the same relief under federal law by a back pay order. (*Born* v. *Laube,* 214 F.2d 349, denying rehearing in 213 F.2d 407 [9th Cir.], cert. denied, 348 U.S. 855 [75 S.Ct. 80, 99 L.Ed. 674] ; *Sterling* v. *Local 438, Liberty Assn. of Steam & Power Pipe Fitters,* 207 Md. 132, 144-146 [113 A.2d 389], cert. denied, 350 U.S. 875 [76 S.Ct. 119, 100 L.Ed. 773], motion for leave to file petition for writ of prohibition denied, 351 U.S. 917 [76 S.Ct. 708, 100 L.Ed. 1450] ; *Real* v. *Curran,* 285 App.Div. 552, 553-555 [138 N.Y.S.2d 809] ; *Mahoney* v. *Sailors' Union,* 45 Wn.2d 453, 460-461 [275 P.2d 440], cert. denied, 349 U.S. 915 [75 S.Ct. 604, 99 L.Ed. 1249].)

Still other courts have held that damages may be given under state law in cases involving violence, apparently singling it out as the critical factor distinguishing the Laburnum case from the Garner case. (*International Longshoremen's etc. Union* v. *Hawaiian Pineapple Co.,* 226 F.2d 875, 883 [9th Cir.], cert. denied, 351 U.S. 963 [100 L.Ed. 1483, 76 S.Ct. 1026] ; *International Union, United Automobile Workers* v. *Russell,* 264 Ala. 456 [88 So.2d 175, 180-182], cert. granted, 352 U.S. 915 [77 S.Ct. 213, 1 L.Ed.2d 121] ; *Tallman Co.* v. *Latal,* 365 Mo. 552 [248 S.W.2d 547, 550-553] ; see *International Union of Electrical etc. Workers* v. *Underwood Corp.,* [2d Cir.], 219 F.2d 100, 101 n. 3; but see *Benz* v. *Compania Naviera Hidalgo, S.A.,* [9th Cir.], 233 F.2d 62, 66, rev'd on other grounds, 353 U.S. 138 [77 S.Ct. 699, 1 L.Ed.2d 709].) Under this analysis the reasons justifying jurisdiction to award damages would be substantially the same as those that justify state injunctive relief in cases of violence. (See 54 Columb.L. Rev. 1147, 1148.) It might seem self-evident, however, even in the absence of the Laburnum case, that if local interest in keeping public order is sufficient to preserve injunctions under

state law, it is sufficient to preserve the less drastic remedy of damages.

A third possible basis for distinction might be found in the court's constant reiteration in its opinion that recovery is grounded on a common-law, apparently as distinguished from a statutory, tort. (See *Friendly Society of Engravers* v. *Calico Engraving Co.*, [4th Cir.], 238 F.2d 521, 524.) Why this distinction is relevant to the state's right to grant relief is not clear, unless it suggests a difference between state laws of general application and laws aimed specifically at labor relations. (See Cox, *Federalism in the Law of Labor Relations*, 67 Harv.L.Rev. 1297, 1321-1324.)

When the Laburnum case is read against the background of the Garner case, it is clear that these factors are not themselves the ultimate tests of state court jurisdiction to apply state law, but indications of whether or not there is a likelihood of conflict between state and federal policy. The possibility of conflict of policies, pointed up in the Garner case, remains the principal consideration, whether damages or injunctive relief, violence or peaceful picketing, common-law or statutory rights to recovery are involved.

Thus, if there is a conflict between state and federal substantive rules in terms of conduct condemned or protected, state law must of course give way no matter what remedy it provides. Likewise, even if state and federal laws have an appearance of harmony, as applied by different tribunals they may become inconsistent and federal policy indirectly thwarted. This potential inconsistency was the consideration that lay behind the Garner decision and prompted the statement that, "A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." (346 U.S. at 490-491.) The notion of "conflicting remedies" is a shorthand way of pointing up this potential conflict in the application of substantive policies. Conversely, the conclusion that there is no "conflict of remedies" would seem to indicate that the different substantive rules as applied by different tribunals will not conflict in terms of conduct condemned or protected, and that once this absence of conflict is assured, federal law does not envisage its preventive remedy as necessarily the only one available to an injured party. (See 53 Mich.L.Rev. 602, 606-609.)

The Laburnum case illustrates this last situation. There was no conflict between the federal and state substantive rules

because the conduct was a tort under Virginia law and an unfair labor practice under the federal statute. There could be no conflict in the application of these rules because of the violent nature of the conduct involved, an element whose presence is underlined by the later description of the Laburnum case in the Weber opinion. (348 U.S. at 477.) The Supreme Court's decision in the present case, in stating that "Laburnum sustained an award under state tort law for violent conduct," whereas the present case involves a "different situation," further emphasizes the importance of violence in Laburnum, and that the rule of that case cannot be automatically extended to all awards of damages. The examples drawn by the court in the Laburnum case from legislative history to support the survival of state remedies all include references to violence (347 U.S. at 668-669), and the court's review was specifically restricted to the question of state jurisdiction "in view of the type of conduct found by the Supreme Court of Appeals of Virginia. . . ." (347 U.S. at 658.) The type of conduct gave assurance that in no event would federal policy be expounded by the board to condone that which the state there condemned.

This assurance was strengthened by the fact that the state was enforcing a law of general application rather than one aimed specifically at labor relations; from Virginia's point of view it was irrelevant that the defendants were labor organizations. Although this consideration is evidently not decisive (see *Weber* v. *Anheuser-Busch, Inc.,* 348 U.S. 468, 479 [75 S.Ct. 480, 99 L.Ed. 546]), its importance is made clear in the last paragraph of the opinion where it is said that, "If petitioners were unorganized private persons, conducting themselves as did petitioners here, Virginia would have had undoubted jurisdiction of this action against them. The fact that petitioners are labor organizations . . . provides no reasonable basis for a different conclusion." (347 U.S. at 669.)

Finally, since the state sought to compensate for a completed wrong rather than parallel the preventive remedy available through the board, the danger of conflict with federal policy was further reduced. However, since damages are a means of enforcing policy and controlling conduct, although somewhat less direct than an injunction, the form of the remedy alone would not seem to be the consideration determining whether state law may conflict with federal law.

It is readily apparent that the present case provides no such assurance that there will not be conflict between state and

federal laws as applied. Defendants engaged in peaceful picketing, not threats and violence; their conduct was not of a type that gives any assurance how the National Labor Relations Board would view it under section 8(b), or that the board might not find it a protected activity under section 7. Furthermore, if recovery were permitted under state law, it would be based, not on law of general application, but on law aimed specifically at labor relations.

Section 303(b) (29 U.S.C. § 187(b)), gives a right of action for damages to any person injured by certain secondary boycott activities described in section 303(a). (29 U.S.C. § 187 (a).) Damages can be awarded under this section by any court that has jurisdiction of the parties, without a prior determination by the National Labor Relations Board that there has been an unfair labor practice. (See *International Longshoremen's Union* v. *Juneau Spruce Corp.*, 342 U.S. 237, 243-244 [72 S.Ct. 235, 96 L.Ed. 275].) It could be argued that these provisions show a congressional willingness to take the risk of inconsistent application by different tribunals of standards bearing on labor relations for the sake of compensating injured persons. A state court awarding damages under section 303, however, would interpret and apply federal law, and its decision could be brought into harmony with board determinations under section 8(b), and federal court adjudications under section 303 on review by the United States Supreme Court. The danger of inconsistency would be considerably less than when recovery is under state law.

Because of the danger of conflict in the application of state law with the National Labor Relations Board's application of the federal statute, the trial court was without jurisdiction to issue an injunction. I am of the opinion that for the same reason it was without jurisdiction to award damages.

Furthermore, even if the federal statute does not bar an award of damages, plaintiffs have no cause of action under the established law of this state. For almost 50 years it has been settled that a closed or union shop is a proper objective of concerted labor activity because reasonably related to union welfare and the betterment of working conditions. This problem has been exhaustively considered in numerous decisions of this court, and the balance of values found to weigh in favor of judicial self-restraint in enjoining or penalizing union activities reasonably calculated to achieve these ends. Nevertheless, a majority of this court now in

effect overrules these cases and abandons a policy whose wisdom is as clear now as it was when first adopted.

As early as *Parkinson Co.* v. *Building Trades Council* (1908), 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550] this court held that it was not unlawful for a union to call a strike of employees and order a boycott to bring pressure on an employer who retained a nonunion worker, and thereby to enforce a closed shop. Exclusion of competition from nonunion workers was held a proper objective of concerted labor activity, and the court was unanimous in considering a strike a proper method of attaining this end.

*McKay* v. *Retail Automobile Salesmen's Union,* 16 Cal.2d 311, 315-325 [106 P.2d 373], presented the precise question involved in the present case: "Is it lawful for a labor union by peaceful picketing to attempt to induce an employer to employ only persons who are members of the picketing union when there is no strike and the employees of the picketed employer are satisfied with their employment and do not desire to join the union." (See dissenting opinion at 338.) The court held that the objective was lawful and had a reasonable relation to the betterment of the conditions of labor, thus reaffirming and extending the principle of the Parkinson case. *Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379, 383-388 [106 P.2d 403], decided at the same time as the McKay case, made it clear that sections 920-923 of the Labor Code do not restrict the right of labor to engage in concerted activity to attain a closed shop. These sections were enacted as a result of the efforts of organized labor, and their purpose was to outlaw the yellow-dog contract, not the closed shop or union activities to obtain a closed shop.

The reasons for permitting picketing to compel a closed shop even when none of the employees belong to the picketing union were articulated in *C. S. Smith Metropolitan Market Co.* v. *Lyons,* 16 Cal.2d 389, 401 [106 P.2d 414] : "The members of a labor organization may have a substantial interest in the employment relations of an employer although none of them is or ever has been employed by him. The reason for this is that the employment relations of every employer affect the working conditions and bargaining power of employees throughout the industry in which he competes. Hence, where union and nonunion employees are engaged in a similar occupation and their respective employers are engaged in trade competition one with another, the efforts of the

union to extend its membership to the employments in which it has no foothold is not an unreasonable aim." The importance of attaining substantial equality in the economic struggle between unions and employers led to the conclusion that picketing to enforce a closed shop should be permitted notwithstanding possible injury to the employer or the non-union worker.

*Magill Brothers, Inc.* v. *Building Service Emp. Intl. Union,* 20 Cal.2d 506, 508 [127 P.2d 542], and *James* v. *Marinship Corp.,* 25 Cal.2d 721, 730 [155 P.2d 329, 160 A.L.R. 900], restated the law as established by the earlier cases, and in *Park & Tilford Import Corp.* v. *International Brotherhood of Teamsters,* 27 Cal.2d 599, 604 [165 P.2d 891, 162 A.L.R. 1426], it was declared once again, and without dissent, that under state law, considered alone, concerted activity for a closed shop is lawful even when undertaken by a union representing none of the employees. In *Charles H. Benton, Inc.* v. *Painters Local Union No. 333,* 45 Cal.2d 677, 681 [291 P.2d 13], a decision handed down at the same time as our first decision in the present case, a majority of the court, obviously with the concurrence of those who dissented on other grounds, stated that, "independently of rights given under the federal statutes, under California decisions an employer may not obtain relief from economic pressure asserted in an effort to compel him to sign a union shop agreement." This proposition was not questioned by the majority in their earlier opinion in the present case.

From this review of the cases it is clear that, as to labor disputes to which federal law is in no way applicable, picketing to compel an employer to sign a closed shop agreement is picketing for a lawful purpose even when none of the employees are union members. We are now told, however, that these cases "have been superseded, in many respects by later law both statutory and decisional," and that to "engage in the task of distinguishing and discussing them now would be a work of supererogation." It is true that the McKay case has been superseded on its precise facts by the Jurisdictional Strike Act (Lab. Code, §§ 1115-1120), if the employees' committee there resisting the union was not "financed in whole or in part, interfered with, dominated or controlled by the employer. . . ." (Lab. Code, § 1117.) The McKay case did not hold, however, as suggested by the majority opinion in the present case, that section 923 of the Labor Code was ineffective as against the constitutional rights

of the defendants. Detailed discussion of section 923 was reserved by the majority in the McKay case for treatment in *Shafer* v. *Registered Pharmacists Union, supra,* 16 Cal.2d 379, decided at the same time, and as stated above, that case squarely held, not that sections 920-923 of the Labor Code were constitutionally ineffective, but that those "sections lay no statutory restraints upon the workers' efforts to secure a closed shop contract from an employer. . . ." (16 Cal.2d at 388.) The court candidly recognized that the argument supporting the present majority's interpretation of section 923 had been accepted by several state courts, but it expressly concluded that such argument "is not in accordance with the law of this state, as judicially declared for many years, nor is it based upon a fair construction of sections 920 to 923 of the California Labor Code, considering their history and purpose." (16 Cal.2d at 388.) Moreover, the controlling effect of the Shafer case cannot be avoided by the suggestion that perhaps the employees here involved had selected a committee to represent them and that therefore the Jurisdictional Strike Act is applicable. The pleadings and findings are barren of any suggestion that plaintiffs are seeking relief under the provisions of that act, and it may confidently be assumed that if there were any factual basis for such relief, plaintiffs would not have overlooked it. Accordingly, unless federal law has changed the rule of the Shafer case when interstate commerce is involved, there is no basis in state law for an award of damages in this case.

In *Park & Tilford Import Corp.* v. *International Brotherhood of Teamsters,* 27 Cal.2d 599, 603-606, 614 [165 P.2d 891, 162 A.L.R. 1426], we grappled with the effect of federal law on state law in this area. At the time of that decision the federal statute made it an unfair labor practice for an employer to enter into a closed shop agreement with a union that did not represent a majority of his employees. It was not an unfair labor practice, however, for a union to picket or use other concerted activity to compel an employer to sign such an agreement. The federal statute as then drawn embraced only employer unfair labor practices, and the National Labor Relations Board had no jurisdiction to provide a remedy for union conduct. We applied state law, but incorporated federal law. We reasoned that since under federal law it was unlawful for the employer to acquiesce in the union's demand for a closed shop, the union's demand and picketing in support of that demand were concerted

activities for an improper purpose. These activities were unlawful as a matter of state law because state law adopted the federal characterization of the objective as improper.

Much has happened in the field of labor law since our decision in the Park & Tilford case, especially in regard to the relation between state and federal law. In the Park & Tilford case we felt it necessary indirectly to enforce federal law through our own rule prohibiting concerted activity for an unlawful purpose, since there appeared to be no other way to protect federal policy from union encroachment. Section 8(3) (now § 8(a)(3)) of the federal act prohibited an employer from signing a closed shop agreement with a union that did not represent a majority of his employees, but the board had no authority to proceed against a union bringing pressure on an employer to do what the act prohibited. This reason for our intervention in support of federal policy was removed by the enactment of the Labor Management Relations Act. That statute makes the union conduct itself an unfair labor practice subject to board control: section 8(b)(2) makes it an unfair labor practice to attempt to force an employer to violate section 8(a)(3). Thus the board is now fully able to assess the impact of union conduct on the federal policy embodied in 8(a)(3), and to vindicate that policy by proceeding directly against the union.

Furthermore, decisions of the United States Supreme Court since the Park & Tilford case, notably *Garner* v. *Teamsters Union,* 346 U.S. 485 [74 S.Ct. 161, 98 L.Ed. 228], and *Weber* v. *Anheuser-Busch, Inc.,* 348 U.S. 468 [75 S.Ct. 480, 99 L.Ed. 546], have made it clear that the definition and vindication of rights created by the federal act rest exclusively with the National Labor Relations Board. As Mr. Justice Carter pointed out in the earlier dissent in the present case, the board is an integral part of the federal law, and that law is not intended to apply when the board is not present. (45 Cal.2d at 668.) Congress has not created abstract rights to be free from unfair labor practices; it has created rights whose scope and nature depend on board definition. Federal policy does not require vindication in state tribunals. On the contrary, it requires that they not conflict with board action by attempting to enforce federal rights either directly, or indirectly by purporting to incorporate them into state law. Thus the very reasons that preclude us from giving injunctive relief for the violation of federal rights indicate that, assuming we could give damages, we should not do so if we

are intelligently to apply our own unlawful purpose doctrine. In no meaningful sense is the purpose unlawful.

The object of defendants' conduct in the present case is unlawful only if we look to federal law to characterize it as such. From what has been said, it is clear that there is no reason to do so. The policy establishing the lawfulness of the purpose under state law is as valid now as it was when this court decided the McKay, Shafer, and C. S. Smith cases. They should not be overruled.

Gibson, C. J., and Carter, J., concurred.

Appellants' petition for a rehearing was denied February 13, 1958. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.